PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY RODRIGUEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ACCIDENT FUND HOLDINGS, INC., a Michigan corporation, d/b/a WWW.COMPWESTINSURANCE.COM,<br><br>Defendant. | Case No. 2:25-cv-03920-SK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT** |

# I.    <u>INTRODUCTION</u>

1.    Californians increasingly conduct their lives and activities over the Internet, sharing often sensitive personal information with companies by using company websites rather than landline telephones.

2.    Defendant created its own online presence at: https://www.compwestinsurance.com (the "Website") to communicate with potential customers, encouraging engagement with this electronic medium – Defendant's Website -- as an alternative to the telephonic or in-person interaction.  Defendant did this to enable potential customers to obtain information from and about Defendant's insurance products, and to enable Defendant to elicit information from potential customers about their specific needs and desires.

3.    Defendant well understands that its Website is a means to communicate privately with potential customers – a consumer expectation that is not only reasonable, but actively nurtured by Defendant.  Indeed, Defendant assures visitors that ***"We are dedicated to handling your personal information with care and keeping it secure."*** *See* https://www.compwestinsurance.com/privacy-policy/ (last accessed November 2024).

4.    Defendant's promise is false.  In reality, Defendant aids third parties including, but not limited to, Meta Systems, Inc., owner of Facebook and Instagram, to surveil every detail of its interactions with visitors to its Website, thereby allowing Meta to create detailed portraits of Website visitors' interests, needs, and desires and bombard them with advertising.

5.    In short, Defendant falsely promised Website visitors that it would protect their privacy, but then secretly monetized their personal information by enabling Meta and other third parties to spy on those visitors, surveil their journey across the web, track their location and lifestyle habits, and bombard them with targeted advertising.  Rather than candidly disclose this arrangement, Defendant explicitly and implicitly assured

Website visitors that their identities and privacy would be protected. In short, Defendant lied.

6. Defendant owns and operates the Website. When users visit the Website, Defendant causes tracking spyware to be installed on Website visitors' internet browsers. Defendant then uses such spyware to collect Website visitors' IP addresses, which enables Defendant and third party spyware companies to learn the location, source, and identity of consumers who happen to land on the Website. Because such spyware capture Website visitors' "routing, addressing, or signaling information," such spyware each constitute either a "pen register" or a "trap and trace device" under sections 638.50(b) and (c) of the California Penal Code.

7. Plaintiff visited Defendant's Website. By installing and using such spyware without Plaintiff's prior consent and without a court order, Defendant violated section 638.51(a) of the California Penal Code. The harm caused by this intrusion is grave. A recent online article describes how the CEO of the world largest data brokerage business "bragged about the degree to which his industry could collect and analyze data on the habits of billions of people."[1] Referring to a hypothetical web user as "Lola," he boasted:

> "At a base level, we know who she is, what she watches, what she reads, and who she's living with. Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that Lola has two children and that her kids drink a lot of premium juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that Lola's income has not been keeping pace with inflation. With CoreAI, we can predict that Lola has a high propensity to trade down to private label. So rather than continuing with messaging for our client's premium brand to Lola, we immediately switch to promote the value brand in their portfolio. Show now she

---

[1]  https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last visited Apr. 4, 2025) (stating that one data brokerage firm, a French advertising conglomerate, Publicis Groupe, could deliver personalized advertising to approximately 91 percent of adult Internet users, *i.e.*, nearly four billion people). The link to the YouTube video of Publicis Groupe's CEO, Arthur Sadoun, serving as the basis of the article is: https://youtu.be/YCsE0VbH3vI (last visited Apr. 4, 2025). The references to the hypothetical Lola consumer begins at the 5:32 mark through the 6:38 mark in such video. The references to Publicis Groupe's ability to see and engage with 91 percent of all adults connected to the Internet begin at the 5:11 mark and is repeated at the 6:39 mark in such video.

sees refreshed content across all screens.  Thanks to CoreAI, we can do that with 91% of adults around the world."

## II.      JURISDICTION AND VENUE

8.      According to Defendant's Notice of Removal, this Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states.  (*See* Notice of Removal ¶ 8; Doc. 1; Page ID #3.)

9.      Defendant is subject to jurisdiction under California's "long-arm" statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."  Defendant engaged in intentional acts by operating its Website and making it available to California residents, deceptively advertising its services and/or products including workers' compensation insurance via its Website to California residents including Plaintiff without clearly and conspicuously disclosing the capture of personal information of California residents without their prior consent.

10.      Defendant expressly aimed its conduct toward California residents by advertising via its Website the fact that it conducts substantial business with residents of the State of California.  For example, the Website has a webpage stating, "CompWest Insurance Company is a dynamic provider of workers' compensation insurance *in California* and select Western states…." https://www.compwestinsurance.com/about/industries-we-serve/ (last visited July 9, 2025) (emphasis added).  The Website advertises the products and services of CompWest Insurance Company, which is a corporation that was formed in the state of California on April 28, 2004.  According to the Statement of Information, Corporation, filed by CompWest Insurance Company on May 13, 2025 with the California Secretary of State's Office, its "Principal Office" is located at 4 Centerpoint Drive, Suite 300, LaPalma, CA

FIRST AMENDED COMPLAINT

90623.   The Website's "Contact" webpage identifies the "Main Office Address" of CompWest Insurance Company as 6 CenterPoint Drive, Suite 375, LaPalma, CA 90623. The City of LaPalma, California is located in Orange County, California.   The Website has a Privacy Policy that has provisions that are specific to California residents.   The Website has a fillable form named "California Privacy Request," which shows that the Website is aware that it is serving a California audience.   The Website's Terms and Conditions has a choice of law that states, "These Terms and Conditions will be governed by and construed in accordance with the laws of the State of California, without reference to its choice of laws rules."   Such Terms and Conditions also state, "By accessing, viewing, or using the materials on the Site, you consent to the jurisdiction of the federal and state courts presiding in San Francisco, California, and agree to accept service of process by mail and hereby waive any and all jurisdictional and venue defenses otherwise available."

11.     The Website is significantly interactive.   The Website has a login feature that allows users to create an online account to the Website.   Plaintiff is informed and believes and thereon alleges that such login feature is highly interactive and allows users to either input and/or edit their account-related information including payment information.   The Website has an interactive search feature on its homepage named "Resource Library" that allows users to conduct keyword searches.   The Website allows users to sign up for the Website's newsletter by inputting the user's email address via the "About" webpage.   The Website has a fillable form named "California Privacy Request."

12.     Plaintiff is informed and believes and thereon alleges that Defendant sells services or products to persons in California as part of its regular course of business based on the fact that the Website expressly aims the Website to the worker's compensation marketplace in California as set forth above.   Plaintiff is informed and believes and thereon alleges that Defendant has either hundreds or thousands of insureds who are either California businesses or individuals.

13.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

### III.        PARTIES

14.     Plaintiff is a resident and citizen of California.  Plaintiff is both: (1) genuinely interested in an employment opportunity with Defendant,[2] which is advertised on Defendant's Website at:  https://www.compwestinsurance.com/careers/; and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law.  As the Ninth Circuit made exceptionally clear, it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that courts must not make impermissible credibility inferences against them in evaluating their Article III standing to sue.  *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

15.     Defendant is incorporated in the state of Michigan.  According to Defendant's Notice of Removal, Defendant's principal place of business is located in Lansing, Michigan.  (Notice of Removal ¶ 12; Doc. 1; Page ID #4.)  Defendant is an insurance conglomerate that markets insurance services.

### FACTUAL ALLEGATIONS

**A.     The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

16.     Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels.  *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or

---

[2] As noted above, the Website's "Contact" webpage identifies the "Main Office Address" of CompWest Insurance Company as 6 CenterPoint Drive, Suite 375, LaPalma, CA 90623.  And, CompWest Insurance Company's recent filing with the California Secretary of State's Office indicates that its "Principal Address" is 4 CenterPoint Drive, Suite 300, LaPalma, CA 90623.

American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

17.    More specifically, privacy protections against the disclosure of personal information are embedded in California statutes and at common law. *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has  repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients*"); In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites), *cert. denied*, 141 S. Ct. 1684 (2021); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

18.    In short, the privacy of personal information is—and has always been—a legally protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy inflicts an actionable "injury" upon an individual.

**B.    The California Invasion of Privacy Act and Pen Registers/Trap and Trace Devices**

19.    The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq.*, to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  (Cal. Penal Code § 630.)

20.    As relevant here, section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

21.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  (Cal. Penal Code § 638.50(b).)

22.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  (Cal. Penal Code § 638.50(c).)

23.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, whereas a "trap and trace device" is a "device or process" that records *incoming* information.  A "pen register" and "trap and trace device" are collectively referred to herein as "Pen-Traps" or "PR/TT".

24.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of those surveillance devices consistent with changes in both federal and state law.

25.    For example, with the passage of the 2001 USA PATRIOT Act, the Pen-Trap definition was expanded to include a device or process to keep up with the advancement and evolution of Internet technologies and communications. In 2015, the California Legislature overwhelmingly adopted this updated and expanded definition without a single vote in opposition.  *See* Stats. 2015, ch. 204, § 1 (A.B. 929) (eff. Jan. 1, 2016); *see also In re Order Authorizing Prospective & Continuous Release of Cell Site*

*Location Recs.*, 31 F. Supp. 3d 889, 898 n.46 (S.D. Tex. 2014) (citing *Susan Freiwald*, *Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of PR/TT technology from mechanical device to computer system)).

26.    For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address that the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if the same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

27.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies when such a reading would not conflict with the statutory scheme."  *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").  This accords with the fact that "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

28.    Individuals may bring an action against the violator of any provision of CIPA—including section 638.51 of the Penal Code—for $5,000 per violation.  (Cal. Penal Code § 637.2(a)(1).)

29.    CIPA provides for a private right of action and imposes civil liability and statutory penalties for the installation of pen register or trap and trace device without a

court order.  Cal. Penal Code § 637.2; *see also Greenley*, 684 F. Supp. 3d at 1050-51. In *Greenley*, the federal district court denied a motion to dismiss in a materially identical case, noting the "expansive language in the California Legislature's chosen decision," *id.* at 1050, which the court held was specific as to the type of data a pen register collects – DRAS – but "vague and inclusive as to the form of the collection tool – 'a device or process.'" *Id.*  The *Greenley* court concluded that the language suggests that "courts should focus less on the form of the data collector and more on the result." *Id.*  Having this legal framework in mind, the court applied the plain meaning to the word "process" and concluded that "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting'" is a process that falls within CIPA's "pen register" definition.  *Id.*

## C. Website Operators Can Deploy Tracking Software to De-Anonymize Otherwise Anonymous Website Visitors and Track and Surveil Such Users.

30.    Individuals who use devices to connect to an Internet website are typically anonymous and expect to remain anonymous.  Some rogue website operators, however, secretly attach a "tracking beacon" to visitor devices that are then used to track and surveil users.

31.    The tracking software will connect fragments of information – such as a unique IP address, user's operating system name, operating system version number, browser name, browser version number, browser language, screen resolution, geolocation data, email address, mobile ad IDs, embedded social media identities, customer and/or loyalty IDs, cookies and device signature – with connections between them. The tracking software also connects and correlates "undeclared identifiers", such as membership in an email or subscriber list, demographics, purchases/transactions, visits to online news sites, survey results, voter registration, and motor vehicle records.

32.     Using tracking software, a website owner can correlate a grouping of fragments and the connections between them to create a unique digital profile of each individual website visitor.  This process is known as "digital fingerprinting."

33.     If a website owner can link a unique digital profile created by digital fingerprinting to a particular individual, the website owner can assemble a detailed picture of a person's private life, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things.  *See* https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/ (last visited Apr. 18, 2024).

34.     Digital fingerprinting of a website's users allows the website owner or its agent to monitor user activity (such as page views, searches, or purchases), de-codes the device used by each website visitor, and enables a website to identify the location, race, age, preferences, internet browsing history, and ethnicity of each user.  This data is captured and processed for the purpose of identifying the source of electronic communications on the website for consumer identification purposes.

35.     The following graphic shows how a website deploying digital fingerprinting spyware has gathered and assimilated the digital fingerprints of a website visitor to create a unique digital identifier and link it to a previously anonymous individual named Mary Smith, thereby revealing a treasure trove of private information about Mary Smith's private life:



36.    In the above example, identity resolution has been achieved: using spyware materially identical to the technology used by the Defendant, the website owner has gathered and assimilated sufficient digital fingerprints of an anonymous visitor to identify that visitor as Mary Smith, and now knows the following information about her:

(a) Full name *(Mary Smith)*

(b) Date of birth *(May 1, 1979)*

(c) Gender *(female)*

(d) Home address *(2345 Avenue C, Papillion Nebraska)*

(e) Marital Status and Family *(Married with two children)*

(f) E-mail address (Mary.Smith@gmail.com)

(g) Personal Cell Phone: *(111) 123-4567*

(h) Voter Registration Status *(Registered)*

(i) Interests *(Shopping, Cooking, Traveling, Reading, Science)*

(j) Employer *(Karen's Fireside, Inc.)*

(k) Title *(Vice President)*

(l) Work Hours *(Daily 9-5)*

37.    For the preceding reasons, the ability to link a unique digital profile to a specific individual using digital fingerprinting is of great monetary value.  Indeed, it has created an entire industry known as "identity resolution."  Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints."  *See* https://www.fullcontact.com/identity-resolution/ (last visited Apr. 18, 2024).

38.    One of the means by which a website owner can gather digital fingerprints as part of its identity resolution efforts is by deploying Pen-Traps spyware on its website.

39.    In lay terms, PR/TT spyware captures electronic impulses that identify the originating source of Internet communication by capturing routing, address, or signaling information.  One means of doing so is to secretly deploy tracking spyware on a website.

40.    Indeed, PR/TT spyware has caught the attention of the United States Director of National Intelligence, who recently explained that "the advancement of digital technology, including location-tracking and other features of smartphones and other electronic devices, and the advertising-based monetization models that underlie many commercial offerings available on the Internet" pose a threat to the individuals and "raises significant issues related to privacy and civil liberties."

**D.    The PR/TT Spyware Is Either a "Pen Register" or "Trap and Trace Device".**

41.    To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is depicted below in Figure 1, which explains how Defendant's Website

transmits instructions back to users' browsers in response to HTTP requests.  *See* Figure 1.

**Figure 1:**



42.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should display.

43.    In addition, the server's instruction cause at least one PR/TT beacon to be installed on a Website user's Internet browser.  The PR/TT beacon then causes the browser to send identifying information—including the user's IP address—to the PR/TT beacon's software provider.

44.    The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132).

45.    Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains the device's geographical location.

46.    Through an IP address, the device's state, city, and zip code can be determined.

47.    Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device.  Thus, knowing a user's IP

address—and therefore a user's geographical location—"provide[s] a level of specificity previously unfound in marketing."[3]

48.    An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and …postal code"[4] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[5]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[6] precisely because "[c]ompanies can use an IP address … to personally identify individuals."[7]

49.    For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with a college-wide WiFi.[8]  For a job fair in a specific city, companies can send advertisements to only those in the general location of an upcoming event.[9]

50.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-

---

[3] *IP Targeting:  Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/; *see* http://web.archive.org/web/20240329095134/www.accudata.com/blog/ip-targeting/ (last visited Oct. 31, 2024).
[4] *Location-based  Targeting  That  Puts  You  in  Control*, Choozle, https://choozle.com/geotargeting-strategies/
[5] Herbert Williams, The Benefits of IP Address Targeting for Local Businesses, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf (last visited Oct. 31, 2024).
[6] *IP Targeting:  Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/; *see* http://web.archive.org/web/20240329095134/www.accudata.com/blog/ip-targeting/ (last visited Oct. 31, 2024).
[7] Trey Titone, The future of IP address as an advertising identifier, Ad Tech Explained (May  16,  2022),  https://www.adtechexplained.com/p/the-future-of-ip-address-as-an-advertising-identifier/ (last visited Oct. 31, 2024).
[8] *IP Targeting:  Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/; *see* http://web.archive.org/web/20240329095134/www.accudata.com/blog/ip-targeting/ (last visited Oct. 31, 2024).
[9] *See, e.g.*, Personalize Your Website And Digital Marketing Using IP Address, Geofli, https://www.geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns (last visited Oct. 31, 2024).

effective than other forms of advertising."[10]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[11]

51.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[12]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[13]

52.    As alleged below, Defendant installs each of the PR/TT beacons on the user's browser for marketing and analytics purposes, and the PR/TT beacons collect information – users' IP addresses – that identifies the outgoing "routing, addressing, or signaling information" of the user.  Accordingly, the PR/TT beacons are each "pen registers."  Alternatively, the PR/TT beacons are each "trap and trace devices" because they collect information – users' IP addresses – that identifies the incoming "routing, addressing, or signaling information" of the user from the vantage point of the Website.

53.    The PR/TT beacon's software provider is a software-as-a-service company that develops the PR/TT beacon provided to website owners like Defendant for a fee. The PR/TT beacon's software provider uses such PR/TT beacon to receive, store, and analyze data collected from website visitors, including visitors of Defendant's Website. The PR/TT beacon's software provider provides analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the PR/TT beacon.

54.    The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the PR/TT beacon on the

---

[10] Herbert Williams, The Benefits of IP Address Targeting for Local Businesses, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf (last visited Oct. 31, 2024).
[11] Id.
[12] Id.
[13] Id.

user's browser.  The PR/TT beacon, in turn, instructs the user's browser to send the user's IP address to the PR/TT beacon's developer.

55.    Moreover, the PR/TT beacon's developer stores a beacon or cookie in the user's browser cache.  When the user subsequently visits Defendant's Website, the PR/TT beacon locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the PR/TT beacon causes the browser to send the beacon or cookie along with the user's IP address to the PR/TT developer.

56.    If the user clears his or her cookies, then the user wipes out the PR/TT beacon from the user's browser cache.  Accordingly, the next time the user visits Defendant's Website, the process begins over again:  (i) Defendant's server installs the PR/TT beacon on the user's browser, (ii) the PR/TT beacon instructs the browser to send to the PR/TT developer the user's IP address, (iii) the PR/TT beacon stores a beacon or cookie in the browser cache, and (iv) the PR/TT beacon's developer will continue to receive the user's IP address on subsequent Website visits with the cookie or beacon transmission.

57.    The PR/TT beacon is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

58.    Further, the PR/TT beacon is a "device" because "in order for software to work, it must be run on some kind of computing device.  It is artificial to claim that software must be viewed in isolation from the computing device on which it runs and with which it is inseparable in regard to the challenged conduct." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 958 (N.D. Cal. 2023).

59.    Because the PR/TT beacon captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of section 638.50(b) of the California Penal Code.  Alternatively, because the PR/TT beacon captures the incoming information—the IP address—from visitors to websites from the

perspective of the websites, it is a "trap and trace device" for the purposes of section 638.50(c) of the California Penal Code.

**E.    Defendant Secretly Installed Tracking Software on Plaintiff's and Other Users' Browsers Without Prior Consent or a Court Order in Violation of California Law.**

60.    Defendant owns and operates the Website.

61.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[14]

62.    Oftentimes, third-party scripts are installed on websites "for advertising purposes." *Id.*

63.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete user profile over time." *Id.*

64.    Defendant has long incorporated the code of the PR/TT beacon into the code of its Website, including when Plaintiff and other users visited the Website.  Thus, when Plaintiff and other users visited the Website, the Website caused the PR/TT beacon to be installed on Plaintiff's and other users' browsers.

65.    As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the PR/TT onto the user's browser.

66.    Upon installing the PR/TT on its Website, Defendant uses the PR/TT to collect the IP address of visitors to the Website, including the IP address of Plaintiff.

---

[14] "Third-party tracking refers to the practice in which a tracker on a website is set by a different website than the one the visitor is currently on. Third-party trackers are snippets of code that are typically installed on multiple websites. They collect and send information about a user's browsing history to other companies, often for advertising purposes. If the same third-party tracker is present on many sites, it can build a more complete user profile over time." https://piwik.pro/glossary/third-party-tracking/ (last visited Apr. 18, 2024).  "[C]ompanies may be in trouble using third-party cookies on their websites without complying with privacy laws in a specific jurisdiction…." *Id.*

67.    The operators of the PR/TT beacons then use the IP address of Website visitors, including those of Plaintiff and other visitors, to serve targeted advertisements and/or conduct Website analytics.

68.    Defendant and its partners use the PR/TT beacon to "digitally fingerprint" each visitor.  While IP addresses alone do not provide exact personal information, they can reveal a user's approximate location, which can be used to infer details about the user's demographics, interests, or behaviors.  When combined together with third-party tracking cookies, which store information about the user's browsing habits and preferences, companies can create highly detailed user profiles.  This level of tracking, especially without clear user consent, can invade a user's privacy because the sharing or selling of the user data to multiple companies can result in unwanted targeted advertising, reduced anonymity, and potential exposure to data breaches.

69.    At no time prior to the installation and use of the PR/TT beacon on Plaintiff's and other users' browsers, or prior to the use of the PR/TT beacon, did Defendant procure Plaintiff's or other users' consent for such conduct.  The PR/TT beacon deploys prior to any efforts to notify visitors or obtain their consent to being tracked.

70.    Nor did Defendant obtain a court order to install or use the PR/TT beacon.

71.    The specific PR/TT spyware beacons detected on Defendant's Website are identified below, which explains the details of the beacons' deployment and the breadth of the beacons' operation.  Plaintiff's investigation of the Website has determined that at least three types of PR/TT spyware are deployed by the Website, *i.e.*, Basis/Centro, Meta/Facebook, and LinkedIn.

**1.    Data Harvesting Without Consent**

72.    When a user visits the Website, distinct third-party tracking services are detected. These entities, recognized as prominent digital trackers, employ sophisticated methodologies to profile users. These methodologies encompass the acquisition of

device IP addresses, synchronizing external identifiers, utilizing TCP/IP header-derived IP addresses, and extracting user agent and device particulars. Additionally, they engage in cookie-sharing practices during request transmissions on the Website.

73.    Plaintiff's investigation of the Website via a computer expert has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's privacy policy.

74.    Defendant's Website lacks any cookie banner for a visitor to the Website to select any cookie-related preferences upon visiting the Website for the first time, which constitutes a consent management platform that manages user consent preferences for data processing activities related to privacy laws.  Thus, the Website is designed so that a visitor can navigate through the various webpages of the Website without having to make any cookie-related preferences.  In other words, a visitor to the Website can read the content of various webpages without having to make any cookie-related preferences.  The following analysis of specific spyware detected on the Website reflects the analysis of such computer expert as an exemplar of what occurs during a typical user visit, and is not an attempt to allege that such expert was investigating the Website during Plaintiff's visit to the Website.

### 2.    Basis (formerly Centro)

75.    The Basis platform works by collecting first-party data from websites. The platform allows advertisers to easily use the first party data to enrich data by looking up user information stored across third-party data platforms.  This is used as segmented audience data that can target users with ad campaigns that are managed via the Basis platform.

76.    The Website tracks and identifies visitors on the Website using the Basis tracking pixel.  Requests are sent to synchronize user cookie data with the server and

1
2
stores cookies on the user's browser that enable the Website to track and target users for the next 12 months.

3
4
5
6
7
8
9
10
11
12
13
14
15


16
### 3.    Meta / Facebook Pixel

77.    Meta's spyware pixel was created by Meta in order to identify website visitors.

78.    The Meta spyware acts via a process known as "fingerprinting."  Put simply, the Meta spyware collects as much data as it can about an otherwise anonymous visitor to the Website and matches it with existing data Meta has acquired and accumulated about hundreds of millions of Americans.

79.    The Meta Spyware gathers device and browser information, geographic information, referral tracking, and other tracking of users by running code or "scripts" on the Website to send user details to Meta.

80.    One leading defense law firm specializing in privacy litigation summarizes the Meta Pixel this way:

27
28

"***The Meta Pixel is a piece of code embedded in the HTML code of a website. When a user visits the website, the Pixel sends Meta information about the user's actions on the website. The Pixel is customizable, allowing the website to track specific user characteristics by changing certain variables in the code. Some Pixel parameters allow Meta to link a user's online actions with their offline purchases in physical stores. . . .Think of the Pixel as a door installed in the website, with Meta on one side of the door and the user on the other. Meta can gather data and see how the user interacts with the website: if they enter their email, if they click on a link, if they add something to their cart. Meta and the website can use this data to better target ads.***"*

*See* https://www.kslaw.com/news-and-insights/the-meta-pixel-an-open-door-to-sensitive-data-and-data-privacy-suits (last accessed Nov. 2024).  Below is a visual depiction of the preceding:



81.   The Meta spyware also requests, validates, and transmits other identifying information, including a website visitor's phone numbers and email addresses.

82.   By sharing Plaintiff's and class members' personal and de-anonymized data with Meta, Defendant effectively "doxed" them.

83.    Requests are sent to Facebook servers to track visitor activity on the Website.  If users are logged in, the third-party Facebook cookies are loaded and sent with the requests.



84.    The c_user cookie is sent with the request, which allows Facebook to identify the user's account that is visiting the Website.



85.    The Meta _fbp cookie is a Facebook identifier that is set by Facebook source code which is stored as first party cookie data and able to track users over the next 90 days.

FIRST AMENDED COMPLAINT

1
2
3
4

### 4.    LinkedIn

86.    The Website sends requests to the LinkedIn tracking pixel to sync visitor data with the audience data stored in the LinkedIn advertising account.



87.    LinkedIn tracking cookies are stored on the visitor's browser.  Notable cookies include bcookie, li_sugr, and UserMatchHistory.



88.    The Bcookie cookie is used by the social networking service, LinkedIn, for tracking the use of embedded services.  The Bcookie is a browser identifier cookie that is used to uniquely identify devices accessing LinkedIn.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

89.     The Li_sugr cookie is a marketing cookie that is used to store and track a visitor's identity using probabilistic matching.

90.     The UserMatchHistory cookie is a marketing cookie to provide advertisement delivery or retargeting. This cookie contains a unique identifier used by LinkedIn to determine that two distinct hits belong to the same user across browsing sessions.

**F.     Defendant's Conduct Constitutes an Invasion of Plaintiff's Privacy.**

91.     The collection of Plaintiff's personally identifying, non-anonymized information through Defendant's installation and use of the PR/TT beacon constitutes an invasion of privacy.

92.     As alleged herein, the PR/TT beacon is designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of user data including Plaintiff's data.

93.     Companies such as Defendant share their users' data with the PR/TT beacon's developer.  In order for such developer to perform data analysis on user data and to assist companies like Defendant to run targeted advertising campaigns, the PR/TT beacon's developer needs to collect data that identifies a particular user.  This is why the PR/TT beacon's developer collects IP addresses:  it allows the developer to segment users in order to run targeted campaigns and perform data analysis.

94.     In other words, companies like Defendant are collecting users' data and sending it to its PR/TT beacon's developer for a profit including by optimizing its marketing campaigns.

**G.     Plaintiff's PR/TT Experience**

95.     Plaintiff has visited the Website within the applicable statute of limitations period via an Internet-connected computer.  In particular, Plaintiff's visit occurred in May 2024.

FIRST AMENDED COMPLAINT

96.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the PR/TT beacon to be installed on Plaintiff's browser. Defendant and the PR/TT beacon's developer then used the PR/TT beacon to collect Plaintiff's IP address.

97.    Defendant and the PR/TT beacon's developer did more than just collect Plaintiff's IP address.  Based on the existence of multiple PR/TT beacons and tracking cookies deployed on the Website, Plaintiff is informed and believes, and thereon alleges, that the PR/TT beacon will collect and track a unique IP address, the Website user's operating system name, operating system version number, browser name, browser version number, browser language, screen resolution, geolocation data, email address, mobile ad IDs, embedded social media identities, customer and/or loyalty IDs, cookies and device signature – as well as the connections between them.  Plaintiff is also informed and believes, and thereon alleges, that Defendant and the PR/TT beacon's developer engaged in the identity resolution tactics described above in order to digitally fingerprint Plaintiff and other users of the Website.

98.    Defendant and the PR/TT beacon's developer used the information collected by the PR/TT beacon to analyze Website data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's and/or advertisers' revenue.

99.    Plaintiff did not provide Plaintiff's prior consent to Defendant to install or use the PR/TT beacon on Plaintiff's browser.

100.    Defendant did not obtain a court order before installing or using the PR/TT beacon.

101.    Plaintiff has, therefore, had Plaintiff's privacy invaded by Defendant's violations of section 638.51(a) of the California Penal Code.

102.    As explained above, Defendant knowingly and intentionally deployed PR/TT spyware to (1) decode and record the routing, addressing, and signaling

FIRST AMENDED COMPLAINT

information transmitted by Plaintiff's electronic device communication; and (2) capture the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication as part of its identity resolution efforts. This conduct constitutes illegal installation of PR/TT spyware in violation of California law.

103.    Defendant did not obtain Plaintiff's knowing and informed consent to the preceding acts, nor did Defendant obtain a court order authorizing it to do so.

104.    Although Plaintiff informed Defendant that its conduct violated CIPA via the filing of the original Complaint in the instant action, Defendant failed to either delete or agree to delete Plaintiff's personal information from its records in response thereto including Plaintiff's IP address.

## H.    Intangible Injury to Plaintiff's Dignity

105.    Plaintiff suffered an injury to her dignity caused by the invasion of her privacy attributable to Defendant's wrongdoing and the wrongdoing of the aforementioned third parties.  Plaintiff has an interest in maintaining control over Plaintiff's private and sensitive information, as well as an interest in preventing their misuse.  Plaintiff suffered the loss of her anonymity in visiting and using Defendant's Website and her right to control information concerning herself due to Defendant's and the actions of third parties who are partners of Defendant in the wrongdoing alleged herein.  As a result of their actions, Plaintiff and her device were digitally fingerprinted and had tracking cookies installed on her browser that tracked her behavior while visiting the Website such as pages viewed.  Such tracking cookies transmitted Plaintiff's *web-browsing history* and other usage data back to the entities that attached the cookies.  The "disclosure of private information" is an intangible harm that is "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC. v. Ramirez*, 594 U.S. 413, 425 (2021).  This is consistent with

longstanding Ninth Circuit precedent recognizing that historical privacy rights " 'encompass[] the individual's control of information concerning his or her person' ... the violation of which gives rise to a concrete injury sufficient to confer standing." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 598 (quoting *Eichenberger*, 876 F.3d at 983).

## I.    Defendant Is a Principal Under Section 31 of the Penal Code.

106.    Section 31 of the Penal Code provides in relevant part:  "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

107.    Under section 31 of the Penal Code, Defendant is a principal of the violation of section 638.51 of the Penal Code by directly committed the act constituting the offense, which is a violation of section 638.51 of the Penal Code.  Alternatively, Defendant is a principal of such offense because it "aid[ed] and "abet[ted] in its commission.  Defendant aided in its commission by agreeing to allow the PR/TT Spyware makers' software to operate on its Website and, in fact, allowing such third-party software to operate on such Website.  Such acts were essential to the commission of the violation of section 638.51.

108.    Defendant knew that the PR/TT Spyware makers would collect personal information when Defendant installed or allowed the installation of the relevant code on its Website.  Defendant also knew that it would receive discounted or higher-quality analytics and other services derived from the data about consumers' online activities, including the option to target advertisements to customers that had merely browsed the Website.

109.    The PR/TT Spyware makers' software in the Website is designed for the purpose of de-anonymizing and tracking visitors of the Website.  The software design is

not a mistake.  *See Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *11 (W.D. Wash. July 2, 2024) ("The SAC alleges that Amazon Connect is designed for the purpose of recording and analyzing communications between its customers (like Capital One) and consumers or other entities.").  Defendant knew this before agreeing to install and allow such third party spyware software to exist and operate on its Website.  "'[I]ntent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he [or she] knows are substantially certain to result from his [or her] conduct.'"  *King v. U.S. Bank National Ass'n*, 53 Cal. App. 5th 675, 712 (2020), *rev. denied,* No. S264308 (Cal. Nov. 10, 2020) (quoting *Schroder v. Auto Driveway Co.*, 11 Cal. 3d 908, 922 (1974)).

110.    Although Plaintiff informed Defendant that its conduct violated CIPA via the original Complaint filed in the instant action, Defendant failed to either delete or agree to delete Plaintiff's personal information from its records in response thereto including Plaintiff's IP address.

111.    At minimum, Defendant's conduct may be considered intentional because it has been made aware of its wrongdoing via the commencement of this action many months ago, but has taken no remedial action to eliminate the wrongdoing.  *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (citing *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021) ("At the pleading stage, … interception may be considered intentional 'where a defendant is aware of the defect causing the interception but takes no remedial action.'") (quoting *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020))).

## IV.    CLASS ALLEGATIONS

112.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All California residents who visited Defendant's website while physically in California and whose personal information was shared with a third party by Defendant without effective and informed prior consent.**

113. <u>NUMEROSITY</u>: Plaintiff does not know the number of Class members but believes the number to be at least one hundred. The exact identities of Class members may be ascertained by the records maintained by Defendant.

114. <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a.   Whether Defendant shared Class members' personal information with any third party;

b.   Whether Defendant obtain effective and informed consent to do so;

c.   Whether Plaintiff and Class members are entitled to statutory penalties; and

d.   Whether Class Members are entitled to injunctive relief.

115. <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

116. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

117. <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is

impracticable and inefficient.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## V.      CAUSE OF ACTION

## FIRST CAUSE OF ACTION

### Violations of the California Trap and Trace Law

### CAL. PENAL CODE § 638.51

118.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

119.   Plaintiff brings this cause of action individually against Defendant.

120.   Section 638.51 of the Penal Code provides that it is illegal for any "person" to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53."  (Cal. Penal Code § 638.51(a).)

121.   A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  (Cal. Penal Code § 638.50(b).)

122.   The PR/TT beacon is a "pen register" because it is a "device or process" that "capture[d]" the "routing, addressing, or signaling information"—the IP address— from the electronic communications transmitted by Plaintiff's computer or smartphone.  (Cal. Penal Code § 638.50(b).)

123.   Alternatively, the PR/TT beacon is a "trap and trace device" because it is "device or process" that "capture[d]" the "incoming electronic or other impulses that identify the originating number or other … routing, addressing, or signaling information"—the IP address—"reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  (Cal. Penal Code § 638.50(c).)

124.    At all relevant times, Defendant knowingly installed the PR/TT beacon—which is either a pen register or trap and trace device—on Plaintiff's browser, and used the PR/TT beacon to collect Plaintiff's IP address, and track Plaintiff.

125.    The PR/TT beacon does not collect the content of Plaintiff's electronic communications with the Website.  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses 'constitute addressing information and do not necessarily reveal any more about the underlying contents of communication than do phone numbers.'") (quotation omitted).

126.    Plaintiff did not provide Plaintiff's prior consent to Defendant's installation or use of the PR/TT beacon.

127.    Defendant did not obtain a court order to install or use the PR/TT beacon.

128.    Pursuant to section 637.2 of the California Penal Code, Plaintiff has been injured by Defendant's violation of section 638.51(a) of the California Penal Code, and seeks statutory damages of $5,000 for Defendant's violation of section 638.51(a).  *See* Penal Code § 637.2(a)(1).

129.    By knowingly violating a criminal statute and accessing Plaintiff's browser to install tracking software without Plaintiff's prior consent, Defendant acted with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

## **PRAYER**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.    An order certifying the Class and making all appropriate class management orders;

b.    For statutory damages, punitive damages, reasonable attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5, and costs of suit; and

c.    For any and all other relief at law or equity that may be appropriate.

1  Dated:  July 14, 2025                    PACIFIC TRIAL ATTORNEYS, APC

2

3                                           By: _/s/ Scott J. Ferrell_____
                                            Scott. J. Ferrell
4                                           Attorneys for Plaintiff

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT