PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EMILY RODRIGUEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ACCIDENT FUND HOLDINGS, INC., a Michigan corporation, d/b/a WWW.COMPWESTINSURANCE.COM,<br><br>Defendant. | Case No.: 2:25-cv-03920-SK<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT** |

Plaintiff Emily Rodriguez ("Plaintiff") alleges as follows:

## I. INTRODUCTION

1. Californians increasingly conduct their lives and activities over the Internet, sharing often sensitive personal information with companies by using company websites rather than landline telephones.

2. Defendant created its own online presence at: https://www.compwestinsurance.com (the "Website") to communicate with potential customers, encouraging engagement with this electronic medium – Defendant's Website -- as an alternative to the telephonic or in-person interaction. Defendant did this to enable potential customers to obtain information from and about Defendant's

insurance products, and to enable Defendant to elicit information from potential customers about their specific needs and desires.

3. Defendant well understands that its Website is a means to communicate privately with potential customers – a consumer expectation that is not only reasonable, but actively nurtured by Defendant. Indeed, Defendant assures visitors that ***"We are dedicated to handling your personal information with care and keeping it secure."*** *See* https://www.compwestinsurance.com/privacy-policy/ (last visited Jan. 27, 2026).

4. Defendant's promise is false. In reality, Defendant aids third parties including, but not limited to, Basis (formerly Centro), Meta Systems, Inc., owner of Facebook and Instagram, LinkedIn, and Google Analytics ("Third Parties") to surveil every detail of its interactions with visitors to its Website, thereby allowing Meta to create detailed portraits of Website visitors' interests, needs, and desires and bombard them with advertising.

5. In short, Defendant falsely promised Website visitors that it would protect their privacy, but then secretly monetized their personal information by enabling Third Parties to spy on those visitors, surveil their journey across the web, track their location and lifestyle habits, and bombard them with targeted advertising. Rather than candidly disclose this arrangement, Defendant explicitly and implicitly assured Website visitors that their identities and privacy would be protected. In short, Defendant lied.

6. The harm caused by this intrusion is grave. A recent online article describes how the CEO of the world largest data brokerage business "bragged about the degree to which his industry could collect and analyze data on the habits of billions of people."[1] Referring to a hypothetical web user as "Lola," he boasted:

[1] https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last visited Apr. 4, 2025) (stating that one data brokerage firm, a French advertising conglomerate, Publicis Groupe, could deliver personalized advertising to approximately 91 percent of adult Internet users, *i.e.*, nearly four billion people). The link to the YouTube video of Publicis Groupe's CEO, Arthur Sadoun, serving as the basis of the article is: https://youtu.be/YCsE0VbH3vI (last visited Apr. 4, 2025). The references to the hypothetical Lola consumer begins at the 5:32 mark through the 6:38 mark in such video. The references to Publicis

Continued on the next page

"At a base level, we know who she is, what she watches, what she reads, and who she's living with. Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that Lola has two children and that her kids drink a lot of premium juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that Lola's income has not been keeping pace with inflation. With CoreAI, we can predict that Lola has a high propensity to trade down to private label. So rather than continuing with messaging for our client's premium brand to Lola, we immediately switch to promote the value brand in their portfolio. Show now she sees refreshed content across all screens. Thanks to CoreAI, we can do that with 91% of adults around the world."

## II. JURISDICTION AND VENUE

7. According to Defendant's Notice of Removal, this Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states. (*See* Notice of Removal ¶ 8; Doc. 1; Page ID #3.)

8. Defendant is subject to jurisdiction under California's "long-arm" statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Defendant engaged in intentional acts by operating its Website and making it available to California residents, deceptively advertising its services and/or products including workers' compensation insurance via

---

Continued from the previous page

Groupe's ability to see and engage with 91 percent of all adults connected to the Internet begin at the 5:11 mark and is repeated at the 6:39 mark in such video.

its Website to California residents including Plaintiff without clearly and conspicuously disclosing the capture of personal information of California residents without their prior consent.

9. Defendant expressly aimed its conduct toward California residents by advertising via its Website the fact that it conducts substantial business with residents of the State of California. For example, the Website has a webpage stating, "CompWest Insurance Company is a dynamic provider of workers' compensation insurance ***in California*** and select Western states…." https://www.compwestinsurance.com/about/industries-we-serve/ (last visited July 9, 2025) (emphasis added). The Website advertises the products and services of CompWest Insurance Company, which is a corporation that was formed in the state of California on April 28, 2004. According to the Statement of Information, Corporation, filed by CompWest Insurance Company on May 13, 2025 with the California Secretary of State's Office, its "Principal Office" is located at 4 Centerpoint Drive, Suite 300, LaPalma, CA 90623. The Website's "Contact" webpage identifies the "Main Office Address" of CompWest Insurance Company as 6 CenterPoint Drive, Suite 375, LaPalma, CA 90623. The City of LaPalma, California is located in Orange County, California. The Website has a Privacy Policy that has provisions that are specific to California residents. The Website has a fillable form named "California Privacy Request," which shows that the Website is aware that it is serving a California audience. The Website's Terms and Conditions has a choice of law that states, "These Terms and Conditions will be governed by and construed in accordance with the laws of the State of California, without reference to its choice of laws rules." Such Terms and Conditions also state, "By accessing, viewing, or using the materials on the Site, you consent to the jurisdiction of the federal and state courts presiding in San Francisco, California, and agree to accept service of process by mail and hereby waive any and all jurisdictional and venue defenses otherwise available."

10. The Website is significantly interactive. The Website has a login feature that allows users to create an online account to the Website. Plaintiff is informed and believes and thereon alleges that such login feature is highly interactive and allows users to either input and/or edit their account-related information including payment information. The Website has an interactive search feature on its homepage named "Resource Library" that allows users to conduct keyword searches. The Website allows users to sign up for the Website's newsletter by inputting the user's email address via the "About" webpage. The Website has a fillable form named "California Privacy Request."

11. Plaintiff is informed and believes and thereon alleges that Defendant sells services or products to persons in California as part of its regular course of business based on the fact that the Website expressly aims the Website to the worker's compensation marketplace in California as set forth above. Plaintiff is informed and believes and thereon alleges that Defendant has either hundreds or thousands of insureds who are either California businesses or individuals.

12. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

## III. PARTIES

13. Plaintiff is a resident and citizen of California.

14. Defendant is incorporated in the state of Michigan. According to Defendant's Notice of Removal, Defendant's principal place of business is located in Lansing, Michigan. (Notice of Removal ¶ 12; Doc. 1; Page ID #4.) Defendant is an insurance conglomerate that markets insurance services.

## IV. FACTUAL ALLEGATIONS

### A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.

15. Every website including the Website is hosted by a server that sends and receives communications in the form of HTTP requests such as "GET" or "POST"

requests to and from Internet users' browsers. For example, when a user clicks on a hyperlink on a Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

16. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

17. Defendant voluntarily integrated "third-party resources" from the Third Parties into the Website's programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

18. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along

with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

19. First-party cookies are those that are placed on the user's browser directly by the web server with which the user is knowingly communicating (in this case, the Website's servers). First-party cookies are used to track users when they repeatedly visit the same website.

20. A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; irxcm.com; clarity.ms, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

21. Historically, the Website has embedded the software code of at least five data brokers[2] registered either with the California Attorney General's Office or the California Privacy Protection Agency. In particular, Plaintiff's investigation has determined that Defendant used Rapleaf/LiveRamp during the August 2022-February 2024 timeframe. Defendant used Lotame, eXelate/Nielsen, Tapad, and Teads during the September 2020-December 2022 timeframe. According to the esteemed Brennan Center for Justice, data brokers are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies, stalkers, and

[2] Under California's law regulating data brokers, a '"Data broker' means a business that knowingly collects and sells to third parties the ***personal information*** of a consumer with whom the business does not have a direct relationship." (Civ. Code § 1798.99.80(c) (emphasis added).)

scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited Nov. 26, 2025).

22. Plaintiff is informed and believes and thereon alleges that the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

• **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

• **Visit History**: Information about the frequency and total number of visits to the Website;

• **Website Interactions**: Data on which links, buttons, or ads on the Website that a user clicks;

• **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

• **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website's content;

• **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

• **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

• **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

• **Referring URL**: Information about the Website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

23. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

24. Defendant owns, operates, and controls the Website, which allows visitors to receive information about its products and services and to purchase such products and services. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

25. Defendant chose to install or integrate the Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, it has complete control over whether first-party and third-party cookies are placed on its users' devices and/or transmitted to third parties.

**B. Defendant's Privacy Policy Confirms that Defendant Uses Third Party Technology to Collect, Use, and Share Visitor Personal Information in Order to Engage in Targeted Advertising of Them.**

26. Defendant's Website has a hyperlink to its the Privacy Policy last updated on December 30, 2019 and made effective on January 1, 2020 (the "Privacy Policy"), which was the applicable version of such Privacy Policy on the date of Plaintiff's May 2024 visit to the Website, which is why it is referenced herein. *See* https://www.compwestinsurance.com/privacy-policy/. The Privacy Policy states, "We are dedicated to handling your personal information with care and keeping it secure." The Privacy Policy also states under the heading, "THE INFORMATION WE COLLECT," in relevant part as follows: "AF Group … respects the privacy of our … web site visitors. When you apply for workers' compensation insurance or other services or products, you provide information about yourself to us. AF Group, our employees, agents, affiliates, and subsidiaries maintain physical, electronic, and procedural safeguards to comply with state and federal regulations to guard your personal information."

27. The Privacy Policy states under the heading, "Automated Means," as follows:

> "We and third-party online advertising and web analytic companies may use cookies, pixel tags, or similar technologies to automatically collect information about your online activity, browser and device (including your IP address) as well

as collect information when you interact with our website(s) or other AF Group offerings. These providers use cookies and pixel tags to help us analyze how users use our website(s) and mobile applications and evaluate your use. [See the "Cookies" section below for more information on these technologies]."

(Privacy Policy)

28. The Privacy Policy states under the heading, "INFORMATION SPECIFIC TO OUR WEBSITE(S)," as follows:

"[W]hile you are visiting or navigating our site, our web server may collect … information from you, such as your domain name, IP address, and the type of browser you are using. … This information will not be disclosed to anyone outside AF Group unless necessary … to offer AF Group products or services to you…."

(Privacy Policy)

29. The Privacy Policy further states under that same heading:

"Additionally, when you visit or use our site, we may place a 'cookie' on your browser. 'Cookies' are small pieces of information transferred from our website to your hard drive that contain a unique identifier recognized by our web server."

(Privacy Policy)

30. The Privacy Policy further states under that same heading:

"Our 'cookies' do not track your activity on third party sites."

(Privacy Policy)

31. The Privacy Policy further states under that same heading:

"Our third-party vendors, such as Google, LinkedIn, Facebook, and others use first-party cookies (such as Google Analytics, Linkedin Insights, Facebook Pixel and Centro Basis Retargeting cookies) and third-party cookies or other third-party identifiers together to gather demographic and behavioral information to better serve our users."

(Privacy Policy)

32. The Privacy Policy further states under that same heading:

> "For more information about how Centro Basis Retargeting collects and uses your information, please review their policies here."

(Privacy Policy)

33. The Privacy Policy, under the heading, "PRIVACY NOTICE REQUIRED BY LAW," provides California residents with a Privacy Notice that states in relevant part:

> "You have the right to know disclosure about what categories and specific pieces of personal information we collect, use, disclose and/or sell during the preceding 12 months. Depending on your relationship with us, those categories are as follows:
>
> • Identifiers, including real name, postal address, unique personal identifier, IP address, email address, and social security number
>
> …
>
> • Internet or other electronic network activity information, ***including browsing history, search history, and information regarding your interaction with an internet website application or activity***."

(Privacy Policy) (emphasis added).

34. The Privacy Policy, under the heading, "PRIVACY NOTICE REQUIRED BY LAW," provides California residents with a Privacy Notice that states in relevant part:

> "We obtain the categories of personal information listed above from the following categories of sources:
>
> …
>
> • Directly or indirectly from your activity on our website(s)[.]"

35. Although the Privacy Policy contends that "[o]ur 'cookies' do not track your activity on third party sites," that is false and/or misleading with respect to the

***third party cookies*** that are used by third parties to track users of the Website.[3] In other words, the Privacy Policy implies in this portion that it only uses first party cookies through the Website. Indeed, the Privacy Policy acknowledges that its "third-party vendors" use "third-party cookies or other third-party identifiers together to gather demographic and behavioral information."

36. Although the Privacy Policy contends that "[o]ur third-party vendors, such as Google, LinkedIn, Facebook, and others use first-party cookies (such as Google Analytics, LinkedIn Insights, Facebook Pixel, and Centro Basis Retargeting cookies)," such statement is inaccurate in multiple respects.

37. First, Google Analytics is used through the Website to provide ***both*** first-party cookies and third-party cookies to Website browsers. Thus, the Privacy Policy's implied assertion that Google Analytics only provides first-party cookies through the Website is inaccurate.

38. Second, Linkedin Insights only provides third-party cookies through the Website and not any first-party cookies. Thus, the Privacy Policy's implied assertion that Linkedin Insights provides first-party cookies through the Website is inaccurate.

39. Third, Facebook Pixel is used through the Website to provide ***both*** first-party cookies and third-party cookies to Website browsers. Thus, the Privacy Policy's implied assertion that Facebook Pixel only provides first-party cookies through the Website is inaccurate.

40. Fourth, Centro Basis Retargeting only provides third-party cookies through the Website and not any first-party cookies. Thus, the Privacy Policy's implied

---

[3] "Third-party tracking refers to the practice in which a tracker on a website is set by a different website than the one the visitor is currently on. Third-party trackers are snippets of code that are typically installed on multiple websites. They collect and send information about a user's browsing history to other companies, often for advertising purposes. If the same third-party tracker is present on many sites, it can build a more complete user profile over time." https://piwik.pro/glossary/third-party-tracking/ (last visited Apr. 18, 2024). "[C]ompanies may be in trouble using third-party cookies on their websites without complying with privacy laws in a specific jurisdiction…." *Id.*

assertion that Centro Basis Retargeting provides first-party cookies through the Website is inaccurate.

41. As mentioned above, the Privacy Policy contains a hyperlink to Centro Basis Retargeting's policies, which, if clicked, takes the user to a landing page setting for the Privacy Policy of Basis Technologies at the URL: https://privacy.basis/com/

42. The Basis Technologies's Privacy Policy acknowledges that its digital advertising technology platform collects, *inter alia*, "the IP address from which the device accesses a client's website or mobile application," "the type of browser and its settings," "information about the geographic location of the device when it accesses a website or mobile application," and "inferences or information about users' interests that are created, acquired, bought, sold, or used by our clients[.]"

43. The Basis Technologies's Privacy Policy acknowledges, "We use the information we collect to serve targeted ads to individuals." Such Privacy Policy explains that "the platform enables our users [*i.e.*, Basis Technologies's customers] to use this information to: … "Determine what ad to show an individual, and to serve that ad (including behaviorally targeted ads) to that individual[.]"

44. Thus, the Centro Basis Retargeting cookies are third-party cookies that are intended to collect personal information in order to serve targeted advertisements to individuals.

## C. <u>**Plaintiff's Investigation Has Detected Pixels, Cookies, and Other Tracking Technologies Operating through the Website.**</u>

45. Plaintiff's investigation of the Website has detected cookies, pixels, and spyware operating through the Website.

46. Plaintiff's investigation of the Website has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to read the Website's Privacy Policy.

47. The browser's developer tools allows for the inspection of third-party cookies stored on a user's device by a website, which reveals the cookie's name, the domain that set it, its category or purpose, and the platform with which it is associated.

48. Third-party cookies can only be set by the third-party server itself, and not by the website directly. Thus, if a third-party cookie is present, it necessarily means that a tracking script from that third party was loaded and successfully executed on the website at issue.

49. Once the tracking script runs, it sends user data to the third party's server. In response, the server sets a cookie in the visitor's browser. This cookie allows the third party to recognize and track the user during future visits even across different websites.

50. Plaintiff's investigation of the Website by and through a computer expert has detected multiple third party cookie code deployed on a user's browser without consent provided by the user immediately upon webpage loading.

51. The screenshot image below of the developer tools panel shows on the right-hand side the third party cookies stored on the user's browser without consent on or about June 24, 2025:




52. As of May 2024 (and even currently), the Website lacked any clear and conspicuous cookie banner displayed on the homepage of the Website. That is, before a visitor could even review the Website's Privacy Policy, the Website's third parties cookies were loading and operational and stored on a visitor's Internet browser and/or hard drive. Thus, visitor data was harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's Privacy Policy.

53. The cookies shown above were deployed to the user's browser before any user has the opportunity to locate and read the Privacy Policy on the Website. These third-party identifiers were used for advertising, analytics, or tracking purposes and represent data collection occurring without prior authorization from the user. That is,

third-party cookies are stored on the visitor's browser when visiting the Website, which lacked any cookie banner displayed on the homepage of the Website. That is, before a visitor could even review the Website's Privacy Policy, the Website's third parties cookies were loading and operational and stored on a visitor's Internet browser and/or hard drive. Thus, visitor data was harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's Privacy Policy.

**1. <u>Basis (formerly Centro)</u>**

54. The Basis platform works by collecting first-party data from websites. The platform allows advertisers to easily use the first party data to enrich data by looking up user information stored across third-party data platforms. This is used as segmented audience data that can target users with ad campaigns that are managed via the Basis platform.

55. Basis has a feature for a private marketplace for buying and selling audience data. The following excerpt is from Basis's website:

> "Private marketplaces (PMPs) are customized, invitation-only ad environments where publisher inventory and audiences are made available to an individual or group of buyers via Deal IDs. Publishers can choose which advertisers have access to this inventory, which tends to be more exclusive and premium than what is made available on the open inventory exchanges."

https://basis.com/technology/dsp/features/private-marketplaces

56. The Website tracks and identifies visitors on the Website using the Basis tracking pixel. Requests are sent to synchronize user cookie data with the server and stores cookies on the user's browser that enable the Website to track and target users for the next 12 months.




2. **<u>Meta / Facebook Pixel</u>**

57. Meta's spyware pixel was created by Meta in order to identify website visitors.

58. The Meta spyware acts via a process known as "fingerprinting." Put simply, the Meta spyware collects as much data as it can about an otherwise anonymous visitor to the Website and matches it with existing data Meta has acquired and accumulated about hundreds of millions of Americans.

59. The Meta Spyware gathers device and browser information, geographic information, referral tracking, and other tracking of users by running code or "scripts" on the Website to send user details to Meta.

60. The website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes. External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.

61. One leading defense law firm specializing in privacy litigation summarizes the Meta Pixel this way:

> "The Meta Pixel is a piece of code embedded in the HTML code of a website. When a user visits the website, the Pixel sends Meta information about the user's actions on the website. The Pixel is customizable, allowing the website to track specific user characteristics by changing certain variables in the code. Some Pixel parameters allow Meta to link a user's online actions with their offline purchases in physical stores. . . .Think of the Pixel as a door installed in the website, with Meta on one side of the door and the user on the other. Meta can gather data and see how the user interacts with the website: if they enter their email, if they click on a link, if they add something to their cart. Meta and the website can use this data to better target ads."

*See* https://www.kslaw.com/news-and-insights/the-meta-pixel-an-open-door-to-sensitive-data-and-data-privacy-suits (last accessed Nov. 2024). Below is a visual depiction of the preceding:




62. The Meta spyware also requests, validates, and transmits other identifying information, including a website visitor's phone numbers and email addresses.

63. By sharing Plaintiff's and class members' personal and de-anonymized data with Meta, Defendant effectively "doxed" them.

64. Requests are sent to Facebook servers to track visitor activity on the Website. If users are logged in, the third-party Facebook cookies are loaded and sent with the requests.




65. The c_user cookie is sent with the request, which allows Facebook to identify the user's account that is visiting the Website.




| Name | Value | Domain | Path | Expires / Max... | Size |
|---|---|---|---|---|---|
| dpr | 1 | .facebook.com | / | 2025-07-01T... | |
| c_user | [redacted] | .facebook.com | / | 2026-06-24... | |
| fr | 1xEgUBTNby6MDTJmw.... | .facebook.com | / | 2025-09-22... | |
| xs | 47%3AmOfqdMiFhGfyiw... | .facebook.com | / | 2026-06-24... | |
| datr | MOZaaL4G9DexEuuE5q... | .facebook.com | / | 2026-07-29T... | |
| sb | X-ZaaNzjxR8hZRJ4LXTij... | .facebook.com | / | 2026-07-29T... | |

66. The Meta _fbp cookie is a Facebook identifier that is set by Facebook source code which is stored as first party cookie data and able to track users over the next 90 days.

3. **LinkedIn**

67. The Website sends requests to the LinkedIn tracking pixel to sync visitor data with the audience data stored in the LinkedIn advertising account.




68. LinkedIn tracking cookies are stored on the visitor's browser. Notable cookies include bcookie, li_sugr, and UserMatchHistory.

| Name | Value | Domain | Path | Expires / Max... | S |
|---|---|---|---|---|---|
| __cf_bm | 7c7R1h97yT6w3dz.QMbzH8... | .linkedin.com | / | 2025-06-24T... | |
| AnalyticsSyncHis... | AQLsa9o8YGSHoAAAAZejP... | .linkedin.com | / | 2025-07-24T... | |
| bcookie | "v=2&6477f4de-02f3-425c... | .linkedin.com | / | 2026-06-24T... | |
| bscookie | "v=1&202506241839326ab... | .www.linkedin.com | / | 2026-06-24T... | |
| li_sugr | eaa230a3-2669-4a73-a22... | .linkedin.com | / | 2025-09-22T... | |
| lidc | "b=VGST02:s=V:r=V:a=V:p=... | .linkedin.com | / | 2025-06-25T... | |
| UserMatchHistory | AQLXw0W0BC9SgwAAAZej... | .linkedin.com | / | 2025-07-24T... | |

69. The Bcookie cookie is used by the social networking service, LinkedIn, for tracking the use of embedded services. The Bcookie is a browser identifier cookie that is used to uniquely identify devices accessing LinkedIn.

70. The Li_sugr cookie is a marketing cookie that is used to store and track a visitor's identity using probabilistic matching.

71. The UserMatchHistory cookie is a marketing cookie to provide advertisement delivery or retargeting. This cookie contains a unique identifier used by LinkedIn to determine that two distinct hits belong to the same user across browsing sessions.

**4. <u>Google Analytics</u>**

72. Although Google Analytics is often categorized as an analytics service, the data transmitted includes persistent identifiers and detailed behavioral signals that allow Google to recognize users across sessions and potentially across sites.

73. The analytics requests transmitted the following categories of information to Google as follows:

- **Persistent identifiers:** includes a Google Analytics client identifier (cid) and session identifiers, enabling recognition of returning visitors and linkage of events across page loads.
- **Page and content data:** including the full-page URL, page title, and referrer information.
- **Device details:** screen resolution, viewport size, language, operating system, browser type, and browser version.
- **Behavioral interaction data:** tracks page view events and scroll depth (e.g., percentage of page scrolled).
- **Timing and session metadata:** timestamps and session counters used to reconstruct visit duration and user engagement.




74. Google cookies sent with the request include __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC. Together, these cookies allow Google to persistently recognize the user, link browsing activity across sessions and websites, and associate analytics events with an identifiable Google account or long-lived browser profile.




75. __Secure-3PSID is a Google cookie that stores a persistent, encrypted identifier used by Google to recognize a user or browser across websites. It supports

user identification, session linkage, and activity correlation, and can be associated with a logged-in Google account.

76. __Secure-3PAPISID is a Google cookie that is used by Google for authentication, security, and advertising-related functions. It enables Google to associate browsing activity with a specific browser or user profile and is commonly used for personalization and cross-site tracking.

77. __Secure-3PSIDCC is a Google cookie that functions as a security and integrity control tied to the primary Google user identifier. It helps validate the authenticity of the session and supports continued recognition of the user across requests.

**D. <u>The Private Communications Collected Are Valuable.</u>**

78. The Private Communications that the Third Parties (and other third parties) track and collect by way of the cookies on the Website are valuable to Defendant as well as the Third Parties (and other third parties). Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit ***other*** websites, even those completely unrelated to Defendant and its products and services.

79. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brand(s) and across the consumer marketplace. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

80. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[4] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

81. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell his data or the consumer's willingness to pay to protect his information.

82. Through its omissions and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**E. Plaintiff's Experience on the Website.**

83. Plaintiff visited the Website in May 2024 and was unaware of the secret spyware being used to surveil Plaintiff and monetize Plaintiff's personal information.

84. Plaintiff is both: (1) genuinely interested in an employment opportunity with Defendant,[5] which is advertised on Defendant's Website at: https://www.compwestinsurance.com/careers/; and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations

---

[4] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

[5] As noted above, the Website's "Contact" webpage identifies the "Main Office Address" of CompWest Insurance Company as 6 CenterPoint Drive, Suite 375, LaPalma, CA 90623. And, CompWest Insurance Company's recent filing with the California Secretary of State's Office indicates that its "Principal Address" is 4 CenterPoint Drive, Suite 300, LaPalma, CA 90623.

imposed by California law. As the Ninth Circuit made exceptionally clear, it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that courts must not make impermissible credibility inferences against them in evaluating their Article III standing to sue. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

85. At the time of Plaintiff's visit to the Website, the Website failed to present any type of a clear and conspicuous pop-up cookie consent banner notifying Plaintiff about either Defendant's Privacy Policy applicable to its Website or requesting Plaintiff's assent to the Website's use of any cookies to collect Plaintiff's information about either Plaintiff's device or about Plaintiff's interactions with the Website. In other words, during Plaintiff's visit to the Website, there was no clear and conspicuous cookie banner displayed on the Website.

86. In other words, the Website failed to provide a "Notice at Collection" of personal information in compliance with the CCPA, (Cal. Civ. Code § 1798.100(a)(1)-(3)), and California's regulation at 11 C.C.R. § 7012 at that time, which are part of the California Consumer Privacy Act Regulations. 11 C.C.R. § 7000(a). Such Regulations define "Notice at Collection" to mean "the notice given by a business to a consumer at or before the point at which a business collects personal information from the consumer as required by Civil Code section 1798.100, subdivisions (a) and (b), and specified in these regulations." 11 C.C.R. § 7001(q).

87. Section 7012 provides, "The Notice at Collection shall be made readily available where consumers will encounter it at or before the point of collection of any personal information." 11 C.C.R. § 7012(c). Such regulation provides an "[i]llustrative example" as follows: "When a business collects consumers' personal information online, it may post a conspicuous link to the notice on the introductory page of the business's website and on all webpages where personal information is collected." 11 C.C.R. § 7012(c)(1). Section 7012 provides, "If a business does not give the Notice at Collection to the consumer at or before the point of collection of their personal

information, the business shall not collect personal information from the consumer." 11 C.C.R. § 7012(d).

88. Because of the absence of a "Notice at Collection" on the homepage of the Website during her visit, as a California resident, Plaintiff reasonably relied upon the absence of such "Notice at Collection" to indicate that the Website was not collecting, using, or sharing Plaintiff's personal information with any third parties during such visit.

89. During Plaintiff's visit, third party cookies began to collect information about Plaintiff's device and Plaintiff's interactions with the Website the moment that Plaintiff landed on the Website without Plaintiff's consent.

90. Plaintiff continues to desire to browse content featured on the Website. Plaintiff likes to browse websites that comply with laws regarding user privacy. Plaintiff does not personally know how the Website is programmed, which can change over time, and Plaintiff does not have the technical knowledge necessary to test a website personally. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

91. Thus, legal damages are inadequate to remedy the imminent threat of future harm that Plaintiff faces. Only an injunction can remedy this threat of future harm.

**F. <u>Defendant's Conduct Is Highly Offensive to a Reasonable Person.</u>**

92. Defendant's scheme – luring visitors to its Website as a legitimate website that is not engaging in any unlawful behavior while secretly partnering with several third party entities to secretly track each visitor and share or sell their private

information to the highest bidders – is highly offensive to a reasonable person for at least several reasons. **First**, it breaches trust and expectations – consumers who are reasonably prudent Internet users expect the Website to be a legitimate website that takes appropriate steps to maintain and safeguard their privacy and complies with all federal and state laws to maintain and ensure the users' privacy during and after their browsing of the Website in which users expect to browse the Website anonymously. **Second**, Defendant secretly used the technology of third parties including cookies (and other spyware) by failing to comply with California law requiring strict disclosure regarding the use, collection, and sharing and/or sale of Californians' personal information to third parties. That kind of dishonesty via a material omission makes the conduct more offensive than ordinary tracking because it undermines autonomy and consent—cornerstones of digital privacy. **Third**, it occurs in a private and presumably anonymous setting in which visitors do not expect their browsing activities to be monitored especially by a third party with whom the visitors have no relationship at all. **Fourth**, it enables unwanted third party surveillance by allowing cross-site profiling and targeted advertising without Plaintiff's consent—something most people find invasive when done in secret. **Fifth**, it violates established privacy norms that companies will be transparent about tracking and obtain meaningful consent.

93. Defendant's conduct creates a genuine likelihood of serious harm to Plaintiff. Plaintiff is informed and believes and thereon alleges that the personal information Defendant surreptitiously harvested via third party cookies (and other spyware) includes name, contact information, location data, browsing behavior, device fingerprints, and interests. This type of information can be — and has been — used for identity theft, targeted harassment, and manipulative advertising. Data brokers purchasing this information can assemble comprehensive profiles to discriminate, exploit, or endanger users, particularly vulnerable populations such as women, minors, and individuals seeking health services. The danger is not abstract: the FTC has warned that data sold to third parties may be used to expose sensitive locations like domestic

violence shelters or reproductive clinics, as well as to facilitate stalking or physical tracking. Such practices impose serious privacy and safety risks, not mere discomfort.

94. The degree and setting of Defendant's intrusion is particularly severe – what sets Defendant's conduct apart is not just the nature of the information collected, but the context in which the intrusion occurred. The tracking took place in a purportedly trusted setting—Defendant's own corporate Website. Instead, Defendant implemented hidden surveillance code that began tracking Plaintiff without disclosure or authorization.

95. Defendant's motives and objectives were both deceptive and exploitative: The purpose of the intrusion further supports its offensiveness. Defendant did not track users for benign analytics or internal operations. Rather, Defendant partnered with multiple third parties known for trafficking in consumer data including geolocation data—and did so to profit off of Plaintiff's personal information. This is not an isolated lapse in oversight; it is a deliberate business strategy premised on deception, surveillance, and commodification of user trust.

96. There are no legitimate or countervailing interests or social norms that render the intrusion inoffensive. **First**, the data at issue is personal to Plaintiff and context-dependent. **Second**, users cannot meaningfully consent to a practice they are never told about. The only "interest" advanced by Defendant is financial profit derived from deception—an interest that cannot render the intrusion inoffensive under California law.

97. The intrusion is "highly offensive." Not only did Defendant's actions violate the CCPA, Defendant's Privacy Policy misrepresents the functioning of "cookies" by inaccurately claiming that "[o]ur 'cookies' do not track your activity on third party sites." Defendant's Privacy Policy also implies that its third-party vendors use only first-party cookies even though, in reality, all four third-party vendors identified in its Privacy Policy use third-party cookies to gather information about the Website's users. Taken together, the factors articulated by California courts—the

severity of the intrusion, the deceptive setting, the potential for serious harm, the exploitative motive, and the lack of any countervailing justification—all weigh heavily in favor of a finding that the intrusion was highly offensive.

**G. <u>Intangible Injury to Plaintiff's Dignity</u>**

98. Plaintiff suffered an injury to her dignity caused by the invasion of her privacy attributable to Defendant's wrongdoing and the wrongdoing of the aforementioned third parties. Plaintiff has an interest in maintaining control over Plaintiff's private and sensitive information, as well as an interest in preventing their misuse. Plaintiff suffered the loss of her anonymity in visiting and using Defendant's Website and her right to control information concerning herself due to Defendant's and the actions of third parties who are partners of Defendant in the wrongdoing alleged herein. As a result of their actions, Plaintiff and her device were digitally fingerprinted and had tracking cookies installed on her browser that tracked her behavior while visiting the Website such as pages viewed. Such tracking cookies transmitted Plaintiff's ***web-browsing history*** and other usage data back to the entities that attached the cookies. The "disclosure of private information" is an intangible harm that is "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC. v. Ramirez*, 594 U.S. 413, 425 (2021). This is consistent with longstanding Ninth Circuit precedent recognizing that historical privacy rights " 'encompass[] the individual's control of information concerning his or her person' ... the violation of which gives rise to a concrete injury sufficient to confer standing." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021) (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)).

**H. <u>Defendant's Knowledge or Intent.</u>**

99. Defendant knew that the cookies makers would collect personal information when Defendant installed or allowed the installation of the relevant code on its Website. Defendant also knew that it would receive discounted or higher-quality

analytics and other services derived from the data about consumers' online activities, including the option to target advertisements to customers that had merely browsed the Website.

100. The cookie makers' software in the Website is designed for the purpose of de-anonymizing and tracking visitors of the Website. The software design is not a mistake. *See Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *11 (W.D. Wash. July 2, 2024) ("The SAC alleges that Amazon Connect is designed for the purpose of recording and analyzing communications between its customers (like Capital One) and consumers or other entities."). Defendant knew this before agreeing to install and allow such third party spyware software to exist and operate on its Website. "'[I]ntent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he [or she] knows are substantially certain to result from his [or her] conduct.'" *King v. U.S. Bank National Ass'n*, 53 Cal. App. 5th 675, 712 (2020), *rev. denied*, No. S264308 (Cal. Nov. 10, 2020) (quoting *Schroder v. Auto Driveway Co.*, 11 Cal. 3d 908, 922 (1974)).

101. Although Plaintiff informed Defendant that its conduct violated CIPA via the original Complaint filed in the instant action, Defendant failed to either delete or agree to delete Plaintiff's personal information from its records in response thereto including Plaintiff's IP address.

102. At minimum, Defendant's conduct may be considered intentional because it has been made aware of its wrongdoing via the commencement of this action many months ago, but has taken no remedial action to eliminate the wrongdoing. *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (citing *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021) ("At the pleading stage, … interception may be considered intentional 'where a defendant is aware of the defect causing the interception but takes no remedial action.'") (quoting *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020))).

## V. CLASS ALLEGATIONS

103. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All California residents who visited** https://www.compwestinsurance.com **while physically in California and whose personal information was shared with a third party by Defendant without effective and informed prior consent.**

104. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be at least one hundred. The exact identities of Class members may be ascertained by the records maintained by Defendant.

105. COMMONALITY: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared Class members' personal information with any third party;

b. Whether Defendant obtain effective and informed consent to do so;

c. Whether Plaintiff and Class members are entitled to statutory penalties; and

d. Whether Class Members are entitled to injunctive relief.

106. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

107. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

108. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Invasion of Privacy

109. To plead an invasion of privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

110. Defendant has intruded upon the following legally protected privacy interests of Plaintiff in violation of the California Constitution, Article I, § 1, which guarantees Californians the right to privacy.

111. Plaintiff had a reasonable expectation of privacy under the circumstances. That is, Plaintiff reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on her devices while Plaintiff browsed the Website. Plaintiff also reasonably expected that Defendant would not permit the Third Parties to track and collect Plaintiff's Private Communications, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website without complying with California law including its Notice at Collection statutory and regulatory requirement.

112. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a

consumer's interaction with an internet website application, or advertisement." Cal. Civ. Code § 1798.140(u)(1)(F).

113. Plaintiff had a reasonable expectation of privacy under the circumstances in regards to her May 2024 visit to the Website, as Defendant omitted material facts that it was duty-bound by California law to provide via a mandatory "Notice at Collection."

114. "A duty to disclose a material fact can arise if … it is imposed by statute…." *Zeichner v. Nord Security Inc.*, 2024 WL 4951261, at *6 (N.D. Cal. Dec. 2, 2024) (quoting *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024)). Here, the CCPA and its regulations imposed upon Defendant a statutory duty to disclose material facts about its collection of personal information from California consumers who used the Website to avoid misleading such consumers about the nature of its personal information collection practices on the Website in May 2024.

115. Defendant violated the foregoing requirements by failing to provide a Notice at Collection in accordance with the CCPA. Such violations of the CCPA constitute material omissions by Defendant arising from a statutorily-prescribed duty.

116. Defendant, in violation of Plaintiff's reasonable expectation of privacy, and without Plaintiff's consent, permits the Third Parties and other third parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendant allowed third parties to collect enables the Third Parties to, inter alia, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties (and other third parties) share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade

Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

117. Defendant's actions constituted a serious invasion of privacy in that it not only violated the CCPA, Defendant's Privacy Policy misrepresents the functioning of "cookies" by inaccurately claiming that "[o]ur 'cookies' do not track your activity on third party sites." Defendant's Privacy Policy also implies that its third-party vendors use only first-party cookies even though, in reality, all four third-party vendors identified in its Privacy Policy use third-party cookies to gather information about the Website's users. These acts constitute an egregious breach of social norms that is highly offensive.

118. Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person.

119. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

120. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

121. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as

disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

122. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**SECOND CLAIM FOR RELIEF**

**Intrusion Upon Seclusion**

123. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

124. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

125. By permitting third-party cookies to be stored on consumers' devices, which enabled the Third Parties (and other third parties) to track and collect Plaintiff's Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

126. The Third Parties' (and other third parties') tracking and collecting of Plaintiff's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties (and other third parties)—was not authorized by Plaintiff.

127. Plaintiff had an objectively reasonable expectation of privacy surrounding her Private Communications on the Website based on state criminal and civil laws

applicable within the state of California designed to protect individual privacy. *See, e.g.*, Cal. Penal Code § 484(a) (prohibiting knowing theft or defrauding of property "by any false or fraudulent representation or pretense").

128. Defendant's intentional intrusion into Plaintiff's and other Website users' Private Communications would be highly offensive to a reasonable person for the reasons set forth above. Defendant caused both first party and third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties. Indeed, Plaintiff reasonably expected, based on California law that Defendant would not cause such first-party or third-party cookies to be stored on her device or permit the Third Parties to obtain her Private Communications on the Website, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

129. Defendant's conduct was intentional and intruded on Plaintiff's Private Communications on the Website.

130. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

131. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

132. By knowingly violating the CCPA and accessing Plaintiff's browser to install tracking software without Plaintiff's prior consent, Defendant acted with oppression and malice. As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a. An order certifying the Class and making all appropriate class management orders;

b. An award of actual damages;

c. An award of punitive damages;

d. An award of nominal damages;

e. An order for full restitution;

f. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

g. An order permanently enjoining Defendant from continuing the unlawful business practices alleged in this Complaint;

h. An order for declaratory relief;

i. For reasonable attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5;

j. For costs of suit as allowed by law; and

k. For any and all other relief at law or equity that may be necessary and appropriate.

Dated: January 28, 2026 PACIFIC TRIAL ATTORNEYS, APC

By: */s/ Scott J. Ferrell*
Scott J. Ferrell
Attorneys for Plaintiff and the Putative Class