UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-03920-SK Date: August 13, 2026

Title Emily Rodriguez v. Accident Fund Holdings, Inc.

Present: The Honorable: Steve Kim, United States Magistrate Judge

| A. Silva-Elder | n/a |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiff(s)/Petitioner(s): | Attorneys Present for Defendant(s)/Respondent(s): |
|---|---|
| None present | None present |

**Proceedings:** (IN CHAMBERS) **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 36]**

**I.**

Plaintiff Emily Rodriguez is a self-proclaimed online privacy tester. (ECF 29 at 25). She visits websites looking for California privacy law violations and then sues the website owners. (ECF 36 at 9; ECF 17-4). In May 2024, she visited the CompWest Insurance Company website operated by defendant Accident Fund Holdings Inc. (AFHI). (ECF 29 at 1, 25). That website serves as a workers' compensation insurance marketplace for businesses. (ECF 29 at 4–5). Plaintiff navigated her computer's web browser to www.compwestinsurance.com, browsed a few webpages, and left. (ECF 41). She did not buy anything, fill out a form, enter any personal or demographic information, or log in to any customer portal. (*Id.*). She did not click through the link for the website's privacy policy (though she read it later for this lawsuit), and she did not opt out of the sharing or sale of her personal information. (*Id.*). And while she alleges that she was "genuinely interested in an employment opportunity" with AFHI at the time, plaintiff admits that she visited the site to test its compliance with "privacy obligations imposed by California law." (ECF 29 at 25–26).

Plaintiff's surface interaction with the AFHI website was no different than the countless others happening on the internet all the time. Every time a person visits a website, the person's browser and the website's server exchange routing metadata. The browser sends an HTTP request that necessarily includes the visitor's IP address—so the web server knows where to send the web pages back to—along with the type and version of the browser, the computer's operating system, and sometimes the URL of the page the visitor may have come from (the "referrer" site). This exchange of routing metadata is not optional—it is intrinsic to how the internet works. Without it, no webpage can load on the visitor's browser. (ECF 26 at 16–17, 23).

At the same time, most modern websites—and certainly any profit-seeking commercial sites—are also programmed to deploy additional software tools that do more than just facilitate the exchange of information needed to make webpages viewable and navigable. Near universally, websites will deploy "cookies" and "tracking pixels" for advertising revenue and web traffic analysis. A cookie is a small text file that the website stores on the visitor's browser. A "first-party" cookie is set by the website the visitor is actually on. (ECF 29 at 7). It lets the website recognize a returning visitor, keep a shopping cart loaded, remember language preferences, and so forth. (*Id.*). A "third-party" cookie is set by a different domain—typically an advertising network or analytics provider whose code the website operator has embedded in the opening page of its site. (*Id.* at 7). A tracking pixel complements third-party cookies. It is a tiny, usually invisible, image hosted on a third-party server run by technology companies like Meta, Google, or LinkedIn. When a visitor's browser loads the webpage, it also loads the pixel, which sends an HTTP request to the third party's server. That request carries at least the same information any HTTP request carries—IP address, browser type, device information, and the URLs of the pages being viewed (i.e., the browsing history).

But those third-party tracking tools do more than just that. Through the tracking pixel, the third party can then match the captured metadata against its own extensive database of user profiles from browsing history on countless other unrelated sites to determine whether the visitor is a known user. That process is sometimes called digital

"fingerprinting." (*Id.* at 18–19). Why do website operators embed these third-party tools? Mostly because they want to understand who visits their websites and whether their advertising works. A company that spends money on Google or Facebook advertisements, for instance, wants to know whether people who click on those ads actually visit the company's website. Analytics tools help answer that question. But the third-party technology companies benefit too. The data that is sent to the analytics providers (Google, Meta, LinkedIn, etc.) for the web-traffic measurement services is also used by those providers to build advertising profiles on users (i.e., the digital fingerprinting). That is the Faustian bargain of the ad-supported internet of today, and it has been the dominant model for commercial websites since the late 1990s.

Consistent with that model, AFHI embedded third-party software code that can be used for digital fingerprinting on its website, www.compwestinsurance.com. That software included Google Analytics (to measure web traffic), Meta's Facebook Pixel (to track advertising conversions from referrers), LinkedIn's Insight Tag (to do the same for LinkedIn advertising), and Basis (formerly Centro) (for retargeting advertising). (*Id.* at 17–24). These are among the most widely deployed internet analytics and advertising tools on the internet.

**II.**

California has been regulating privacy longer than any other state. In 1972, voters amended the state constitution to include privacy among the "inalienable rights" in Article I, Section 1. Twenty-two years later, the California Supreme Court held in *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1 (1994), that this provision creates a private right of action against private parties—not just the government. *Id.* at 20. Separately, California recognizes the four common-law privacy torts from the Restatement of Torts, including intrusion upon seclusion. *See Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009). In practice, the constitutional and common-law privacy claims are treated as functionally identical. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig*. ("*Facebook Tracking*"), 956 F.3d 589, 601 (9th Cir. 2020).

These privacy remedies, though, were built for a pre-internet world. The intrusion-tort was designed for peeping Toms and hidden microphones, not for HTTP requests. The *Hill* test was developed in a case about drug testing of college athletes, not about advertising pixels. These frameworks did not envision internet tracking in the 2000s and 2010s. *See, e.g.*, *Hill*, 7 Cal. 4th at 35–37 (constitutional privacy violation requires legally protected privacy interest, reasonable expectation of privacy, and conduct constituting serious invasion); *see also Loder v. City of Glendale*, 14 Cal. 4th 846, 893 (1997) (requiring courts to "weed out" de minimis intrusions to privacy). So claims based on cookie tracking, referrer-header transmission, and analytics data were dismissed at the pleading stage with striking regularity. *See, e.g., Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012); *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705 (N.D. Cal. 2011).

The California legislature recognized this gap. In 2003, it passed the California Online Privacy Protection Act (CalOPPA), requiring commercial websites to post a privacy policy. *See* Cal. Bus. & Prof. Code §§ 22575–22579. Enforcement, though, was left to the State's Attorney General. In 2018, the legislature enacted the California Consumer Privacy Act (CCPA), which gave consumers statutory rights to know what personal information businesses collect, to delete that information on request, and to opt out of its sale or sharing. *See* Cal. Civ. Code §§ 1798.100–1798.199.100. The CCPA defines "personal information" broadly to include "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1). Thus, personal information as defined in the CCPA was understood to include IP addresses, browsing history, and device identifiers. Like CalOPPA, the CCPA concentrated enforcement in the Attorney General, though it allowed some limited private suits for certain types of data breaches. *See* Cal. Civ. Code § 1798.150(a). To enforce that limitation, the legislature added an express anti-bootstrapping provision

in the CCPA: "Nothing in this title shall be interpreted to serve as the basis for a private right of action under any other law." Cal. Civ. Code § 1798.150(c).

Around the same time that CCPA was enacted, California amended the California Invasion of Privacy Act (CIPA) prohibiting wiretapping and eavesdropping to add the unauthorized use of pen registers and trap-and-trace devices. Conventionally, pen registers are devices that collect outgoing routing information from telecommunications devices (e.g., the telephone number dialed to call a friend); trap-and-trace devices, on the other hand, capture incoming connection data (e.g., the numbers of the friends who return the call). *See generally* Cal. Penal Code § 638.50(b)–(c). Unlike CalOPPA and CCPA, however, CIPA not only criminalized violations of the law but permitted a private right of action for unlawful communication interceptions—and, most pertinent here, provided for $5,000 in statutory damages per violation. *See* Cal. Penal Code § 637.2. CIPA thus became a hotbed of privacy lawsuits against website operators—which is to say, nearly every business or organization in existence—on the remunerative theory that website cookies or tracking pixels were the digital equivalent of "pen registers" or "trap-and-trace devices." A wave of CIPA lawsuits followed with courts divided on whether CIPA covers routine website tracking activities alone. *Compare, e.g.*, *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1153 (N.D. Cal. 2025); *Shah v. MyFitnessPal, Inc.*, 824 F. Supp. 3d 906, 920 (N.D. Cal. 2026), *with, e.g.*, *Blaker v. NetScout Sys., Inc.*, 2026 WL 1709143, at *2–4 (Cal. Super. Ct. May 27, 2026); *In re Meta Android Privacy Litig.*, 2026 WL 1279416, at *8 (N.D. Cal. May 11, 2026); *Balabbo v. Wildflower Brands, LLC*, 2026 WL 2124151, at *9–10 (Cal. Super. Ct. Apr. 6, 2026); *Rodriguez v. Ink Am. Int'l Grp. LLC*, 2025 WL 4034985, at *3 (Cal. Super. Ct. Dec. 10, 2025); *Sanchez v. Cars.com Inc.*, 2025 WL 487194, at *3 (Cal. Super. Ct. Jan. 27, 2025).[1]

[1] The scope of CIPA continues to be litigated actively in the California state courts. *See, e.g.*, *Variety Media, LLC v. Superior Court* (Cal. Ct. App. Case No. B350578). Significant legislative efforts are also underway not only to close what businesses perceive as a CIPA loophole but also to curb uses of the CCPA that some courts were permitting despite the anti-bootstrapping provision. For instance, proposed California Senate Bill 690 eliminates the CIPA private right of action for California Penal Code §§ 638.50, 638.51—the pen register and trap-and-trace provisions. *See* S.B. 690, 2025-2026 Leg., Reg. Sess.

Plaintiff's lawsuit is of a piece with that phenomenon. On behalf of herself and a putative class, plaintiff originally sued AFHI in Los Angeles County Superior Court for a single statutory claim under CIPA, claiming that the Meta Pixel tools embedded on AFHI's website are pen registers and trap-and-trace devices intercepting personal information as defined by the CCPA. (ECF 1-1). AFHI then removed the action to federal court based on the Class Action Fairness Act. *See* 28 U.S.C. § 1332(d). (ECF 1). After plaintiff amended the complaint to add allegations about two additional trackers (Basis and LinkedIn), AFHI moved to dismiss the first amended complaint for lack of personal jurisdiction and for failure to state a claim. (ECF 17). At the hearing on that motion, this court found that personal jurisdiction exists but also agreed (for different reasons) with AFHI's general position that plaintiff's claims are not actionable under CIPA. (ECF 22; ECF 26 at 22–24). To the extent that plaintiff's claims were cognizable, they plausibly alleged violations of the CCPA—though, such violations are ordinarily enforceable only by the California Attorney General, not private citizens. Plaintiff thus asked for permission—and was given leave—to file a second amended complaint. (ECF 22). In the second amended complaint, plaintiff now alleges a state-law constitutional claim for invasion of privacy and a state common-law claim for intrusion upon seclusion. (ECF 29 at 33–37). AFHI now moves again to dismiss that operative complaint for failure to state a claim on which relief may be granted. (ECF 36).

## III.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). To survive, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). While the court must take all nonconclusory and well-pled factual allegations as true, *see Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154,

1160 (9th Cir. 2019), it cannot make "unreasonable inferences" or "unwarranted deductions of fact." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *as amended*, 275 F.3d 1187 (9th Cir. 2001).

Here, the second amended complaint is just a repackaged version of the first amended complaint. To understand why, consider what a privacy-compliant website viewable in California must look like. The CCPA and CalOPPA impose two principal obligations on website operators: disclose and offer choice. Under CalOPPA, the website must conspicuously post a privacy policy identifying the categories of personal information collected and the third parties with whom it is shared. *See* Cal. Bus. & Prof. Code § 22575. Under the CCPA, the operator must provide a "notice at collection," offering consumers the right to opt out of the sale or sharing of their personal information. *See* Cal. Civ. Code §§ 1798.100, 1798.120; Cal. Code Regs. tit. 11, § 7012. In practice, most California consumers see: a link to a privacy policy in the website's footer; sometimes, a cookie banner asking them to accept or reject (all or only essential) cookies; and, on websites that sell or share personal information, a "Do Not Sell or Share My Personal Information" link. Consumers who want to limit tracking can click the opt-out link, enable their own privacy controls with native browser features, or use ad-blocking software. Consumers who do not take any of these steps, though, continue to be tracked under the default regime that the California legislature permits. That last point merits emphasis: CalOPPA and CCPA do not prohibit tracking—they only regulate it by requiring transparency and consumer choice.

Now consider the material allegations in plaintiff's second amended complaint. When she navigated her browser to AFHI's website, plaintiff says that "immediately upon webpage loading," third-party tracking software began collecting 12 categories of "personal information": browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behavior, device information, referring URL, session information, user identifiers, and geolocation data. (ECF 29 at 8–9, 14). According to plaintiff, the website lacked any clear conspicuous cookie consent banner, so the data was harvested *before* she could review or decline the

privacy policy. (ECF 29 at 16, 25–27). Recall that under the CCPA, California consumers have a statutory right to "notice at collection," offering consumers the right to opt out of the sale or sharing of their personal information—as defined by the CCPA. Claiming that AFHI's website failed this notice-timing requirement, plaintiff argues that it doesn't matter whether the website's homepage contains a link to the company's privacy policy at the bottom of the page. (ECF 29 at 10–13; ECF 39 at 6).

Still, plaintiff quotes at length from that policy, which says in pertinent part: "third-party online advertising and web analytic companies may use cookies, pixel tags, or similar technologies to automatically collect information about your online activity, browser and device (including your IP address)" and that its "third-party vendors, such as Google, LinkedIn, Facebook, and others" use cookies "to gather demographic and behavioral information." (ECF 29 at 10–11; ECF 37-1). The policy also informs California residents of their right to opt out of the sale of personal information. (ECF 37-1 at 9).

Relevant here, plaintiff does not allege that she exercised her right to opt out of the sale or sharing of her personal information under the CCPA. (ECF 36 at 11–14, 19). Nor does plaintiff anywhere allege that she clicked through to the website's privacy policy at the time of her online visit. After the fact, though, she has now read that policy and contends that it is misleading because it doesn't clearly differentiate between first-party cookies and third-party cookies. But whether this notice fully complied with every requirement of the CCPA and its implementing regulations—including Cal. Code Regs. tit. 11, § 7012(f)—is not before the court. The question instead is whether the same facts showing a mere CCPA violation can be bootstrapped into a private right of action. Remember that the CCPA has an anti-bootstrapping rule: "Nothing in this title shall be interpreted to serve as the basis for a private right of action under any other law." Cal. Civ. Code § 1798.150(c). So to circumvent that restriction, plaintiff first sued under CIPA arguing that the third-party software was a pen register and trap-and-trace device. Having lost that argument, she now contends that the privacy violations alleged in her complaint are actionable under California constitutional and common law.

So the question is whether those claims can stand on their own elements—either independent of a mere CCPA violation or combined with a CCPA violation. Functionally, both claims for the common-law tort of intrusion upon seclusion and a California Constitution claim for invasion of privacy share materially identical elements. *See Facebook Tracking*, 956 F.3d at 601. To prevail on either claim, then, plaintiff must plausibly allege that (1) she had "a reasonable expectation of privacy," and (2) defendant's intrusion upon her privacy was "highly offensive." *Id.* Plaintiff has not plausibly alleged either. And at the hearing on this motion, plaintiff's counsel confirmed that plaintiff did not read the privacy policy—or its statements about cookies—during her May 2024 visit; identified no concrete harm that the collection caused her beyond the dignitary injury alleged in the complaint; and identified no new factual allegations that a third amended complaint would contain. Given those answers, plaintiff cannot state any version of these claims that can survive the pleading stage.

### A. Reasonable Expectation of Privacy

Whether a user has a reasonable expectation of privacy depends on "whether a defendant gained 'unwanted access to data by electronic or other covert means, in violation of the law or social norms.'" *Facebook Tracking*, 956 F.3d at 601–02 (quoting *Hernandez*, 47 Cal. 4th at 286). To answer this question, courts examine "a variety of factors, including the customs, practices, and circumstances surrounding a defendant's particular activities." *Id.* at 602 (citing *Hill*, 7 Cal. 4th at 36). Courts also consider "the opportunity to be notified in advance and consent to the intrusion." *Hernandez*, 47 Cal. 4th at 287. For website users in California, state law has created certain privacy expectations consistent with these requirements of notice and consent. Recall that CCPA gives consumers the right to direct a business not to sell or share their personal information with third parties—including sharing for the cross-context behavioral advertising that third-party analytics providers facilitate. *See* Cal. Civ. Code §§ 1798.120(a), 1798.140(ah); *accord Shah*, 824 F. Supp. 3d at 916–17. Businesses must give notice of collection and a means to exercise that right, which typically takes the form of a popup banner or link to the privacy policy, like the link in this case. *Id.*;

Cal. Code Regs. tit. 11, § 7012(a). Due to those requirements, California users are presumably accustomed to seeing those options online and understand the opt-out mechanism to be an available means to prevent the sale or sharing of the data that cookies collect.

But the right to reject the collection or sharing of personal information is not grounded in a per se prohibition against tracking and collection. To the contrary, the legislature recognized that companies were selling information collected over the internet and permitted them to continue doing so—until they received an opt-out request. (ECF 36 at 21). At the same time, a user has a reasonable expectation of privacy as to online activity that a website affirmatively represents that it will not track. *See Facebook Tracking*, 956 F.3d at 602. For example, users have a reasonable expectation of privacy in their data after logging out of an application—like Facebook—when the privacy policy states that the application will not collect data after the user logs off. *Id.*; *see In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 151 (3d Cir. 2015) (holding that users have reasonable expectation of privacy in browsing history after they deny consent for Google to track their browsing); *Shah*, 824 F. Supp. 3d at 916 (same).

Plaintiff herself recognizes this framework, stating that the CCPA's provisions are "highly relevant customs, practices, and circumstances" that "provide Californians with the reasonable expectation that they will have some control over their data and . . . ability to opt out." (ECF 38 at 19). But plaintiff does not allege that she opted out. Having declined to invoke the very mechanism that, on her own theory, gives rise to the expectation of privacy, she cannot claim the expectation was violated. This conclusion is not inconsistent with *Facebook Tracking*'s admonition that a user's failure to "take[] additional measures to prevent cookies from tracking" is a "fact-based defense" that cannot defeat privacy claims at the pleading stage. 956 F.3d at 605–06. There, the plaintiffs' reasonable expectation of privacy existed independently of any self-help tool: Facebook had affirmatively represented that it would not track logged-out users, so

browser-level protections were, at most, mitigation of an intrusion the defendant had already promised away. *Id.* at 602.

Here, by contrast, the CCPA opt-out is not a protective measure layered on top of a preexisting expectation of privacy—on plaintiff's own theory, it is the source of the expectation. (ECF 38 at 19). But a statutory regime that permits the sale and sharing of personal information unless and until the consumer objects cannot supply a reasonable expectation that data will not be shared to a consumer who never objected. Declining to invoke the right is not a failure to mitigate an unwanted intrusion; it leaves in place the default rule of permitted sharing that the legislature chose. The decisions that plaintiff relies on confirm the point—because each involves a plaintiff who *did* opt out and was tracked anyway. *See, e.g.*, *Shah*, 824 F. Supp. 3d at 916; *D'Antonio v. Smith & Wesson Inc.*, 820 F. Supp. 3d 928, 935 (N.D. Cal. 2026); *Wiley v. Universal Music Group*, 826 F. Supp. 3d 1121, 1134 (N.D. Cal. 2025); *Gabrielli v. Haleon US Inc.,* 815 F. Supp. 3d 852, 868 (N.D. Cal. 2025); *Shah v. Politico LLC*, 2026 WL 323269, at *4 (N.D. Cal. Feb. 6, 2026); *Pemberton v. Rest. Brands Int'l, Inc.*, 2025 WL 3268404, at *4 (N.D. Cal. Nov. 24, 2025). These collected cases hold only that the promises in post-opt-out tracking policies create a reasonable expectation of privacy that no tracking will happen after opting out. As they should. They say nothing to help a plaintiff who never opted out.

Plaintiff's fallback is a timing theory built on the CCPA's implementing regulations: because the third-party cookies deployed "immediately upon webpage loading" before she could encounter any notice, the collection itself allegedly violated the rule that a business that fails to give notice at collection "shall not collect personal information from the consumer." (ECF 29 at 14, 26–27) (quoting Cal. Code Regs. tit. 11, § 7012(d)). And because the reasonable-expectation inquiry asks whether the defendant gained access to data "in violation of the law or social norms," *Facebook Tracking*, 956 F.3d at 601–02, plaintiff reasons that a regulatory violation alone supplies the expectation—no opt-out required. That theory fails at each step. Plaintiff alleges only the absence of a popup banner (ECF 29 at 26), but the regulation does not require a banner, Cal. Code Regs. tit. 11, § 7012(c)—and the complaint alleges no facts

about the privacy-notice link that was there (its placement, size, or visibility) from which the court could infer that the notice given through that link was inadequate. (ECF 37-1; ECF 39 at 6–8). An allegation that the mandated form of notice was missing is not an allegation that the permitted form of notice was insufficient.

Next, even assuming a notice-timing violation, "violation of the law" is one input into the expectation inquiry—not a substitute for it. The expectation must attach to the *information*: courts ask whether the plaintiff had a reasonable expectation of privacy in the data accessed, with the surrounding legal norms as context. *See Facebook Tracking*, 956 F.3d at 601–02. A technical defect in the timing or format of notice does not transform routing metadata—data in which internet users hold no recognized privacy interest, and which California law permits to be collected and shared under a disclosed, opt-out regime—into private information. If it did, every regulatory foot-fault would convert the CCPA's administrative scheme into a strict-liability tort, one webpage load at a time.

Which is the final and decisive point. Plaintiff is free to invoke the CCPA as evidence of the "customs, practices, and circumstances" that shape Californians' expectations—both sides do, and so does this order. (ECF 36 at 21; ECF 38 at 19; ECF 39 at 7). What she cannot do is bring a claim whose every element is supplied by the alleged statutory violation itself. Strip the alleged notice defect from the second amended complaint and nothing remains: no promise broken, no sensitive data taken, no opt-out ignored. A tort claim that rises and falls entirely with a CCPA notice violation is a CCPA claim, and the legislature has said that statute "shall [not] be interpreted to serve as the basis for a private right of action under any other law." Cal. Civ. Code § 1798.150(c). The line between using the statute as evidence of social norms and using it as the basis for the action is the line between plaintiff's theory and the opt-out cases she cites: there, the statutory backdrop informed an expectation that the defendant's own broken promise violated; here, the statutory violation *is* the claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-03920-SK Date: August 13, 2026

Title Emily Rodriguez v. Accident Fund Holdings, Inc.

Indeed, despite the seeming breadth of the twelve categories plaintiff identifies in her second amended complaint, the overwhelming majority are of routing-type and device information in which courts have held internet users have no privacy interest. *See Popa v. Microsoft Corp.*, 153 F.4th 784, 786 (9th Cir. 2025) (collection of "the device the user accessed the website on, the type of browser . . . [and] the operating system," along with the products viewed, bears no resemblance to any harm traditionally actionable at common law); *cf. United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (Under Fourth Amendment, "e-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information"). Two of the remaining categories—demographic information and interests and preferences—are by plaintiff's own record, inferences generated by third parties rather than information disclosed by plaintiff. (ECF 36 at 10–11). And the last category—user input data—is information plaintiff never alleges she entered. (*Id.*). In short, the collection of non-private routing type information that California law permits to be shared absent opt-out does not resemble any harm traditionally actionable at common law based on a reasonable expectation of privacy. *Compare, e.g., Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 843 (E.D. Cal. 2025) ("[C]ommunications with Defendants' Web Properties divulged information relating to their specific medical conditions, diagnoses, treatment, treating physicians, and patient status."); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117 (S.D. Cal. 2023) (users have expectation of privacy in sensitive health data transmitted by hospital's website to Meta).

"Generally, the internet is not a place where users have a reasonable expectation of privacy." *Thomas v. Papa Johns Int'l, Inc.*, 2024 WL 2060140, at *1 (S.D. Cal. May 8, 2024), *aff'd*, 2025 WL 1704437 (9th Cir. June 18, 2025). Plaintiff points to no controlling authority that the mere act of accessing a website and browsing pages creates a reasonable expectation of privacy that no information will be collected by site owners—especially where plaintiff has not opted out of collection. *See Shah*, 824 F.

Supp. 3d at 906; *Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229, at *14 (N.D. Cal. Oct. 16, 2025). Because plaintiff denies entering any genuinely private information—either demographics, interests and preferences, or even any input data—she cannot plausibly allege a reasonable expectation of privacy in the mere collection of metadata collected when she visited AFHI's workers' compensation website and browsed a few pages. *See Hughes v. Vivint, Inc.*, 2024 WL 5179916, at *4–5 (C.D. Cal. July 12, 2024) ("As Plaintiff does not clearly allege what personalized information of hers was actually collected, she does not identify any harm to her privacy."); *cf. Mikulsky v. Noom, Inc.*, 682 F. Supp. 3d 855, 864 (S.D. Cal. 2023) ("[T]he Court is unable to determine whether the 'personal information' Plaintiff inputted is protected or whether it was merely information akin to basic contact information that would not trigger a protectable privacy interest."). Routine internet tracking today—with nothing more—cannot create a reasonable privacy expectation enforceable by California's privacy torts. *See Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022); *Williams v. DDR Media, LLC*, 2023 WL 5352896, at *6–7 (N.D. Cal. Aug. 18, 2023); *Morilha v. Alphabet, Inc.*, 2024 WL 5205542, at *4–5 (N.D. Cal. Dec. 23, 2024).

### B. Highly Offensive Intrusion

Even assuming a reasonable expectation of privacy, the alleged intrusion was not highly offensive. To successfully plead the second element of a privacy invasion, the intrusion in question must be "'highly offensive' to a reasonable person, and 'sufficiently serious' and unwarranted so as to constitute an 'egregious breach of the social norms.'" *Facebook Tracking*, 956 F.3d at 606 (quoting *Hernandez*, 47 Cal. 4th at 295). The California Supreme Court has observed that this bar is set high because "[n]o community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy." *Hill*, 7 Cal. 4th at 37. To determine whether a defendant's actions rise to the level of "highly offensive," courts consider a variety of factors "such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-03920-SK Date: August 13, 2026

Title Emily Rodriguez v. Accident Fund Holdings, Inc.

as well as the use of deceit. *Facebook Tracking*, 956 F.3d at 606. Here, plaintiff does not plausibly allege that AFHI's use of third-party pixels and cookies on its website "caused her to experience any kind of harm that is remotely similar to the 'highly offensive' interferences or disclosures that were actionable at common law." *Popa*, 153 F.4th at 791.

Although offensiveness is not always resolved at the pleadings stage, *see Facebook Tracking*, 956 F.3d at 606, many courts address this element if the "undisputed material facts show. . . an insubstantial impact on privacy interests." *Mastel v. Miniclip SA,* 549 F. Supp. 3d 1129, 1140 (E.D. Cal. 2021) (quoting *Hill*, 7 Cal. 4th at 40); *see also Hammerling v. Google LLC*, 2022 WL 17365255, at *9 (N.D. Cal. Dec. 1, 2022); *Williams*, 2023 WL 5352896, at *6–7; *Morilha*, 2024 WL 5205542, at *4–5. Courts retain the duty to "weed out" claims involving "so insignificant or de minimis an intrusion" as not even to require justification by the defendant. *Loder*, 14 Cal. 4th at 893. So it is here.

Two features of the operative complaint defeat the offensiveness element. The first is the *Facebook Tracking* factor that leads the holistic inquiry: the likelihood of serious harm to the victim. 956 F.3d at 606. Here, that likelihood is nil. For both claims, plaintiff alleges an intangible "injury to her dignity" and "the loss of her anonymity," plus a boilerplate assertion that she "has been damaged by Defendant's invasion of her privacy and is entitled to just compensation." (ECF 29 at 30, 35, 37). She does not allege anything concrete—financial loss, identity theft, or any other harm ordinarily associated with disclosure of sensitive data. *See Thomas*, 2024 WL 2060140, at *5–6 (collecting cases finding highly offensive data collection). The second is the nature of the information itself. Except for user input data—which plaintiff admits she did not provide—every category she identifies falls within the CCPA's definition of "personal information," Cal. Civ. Code § 1798.140(v)(1)—information that businesses may collect upon notice and may sell or share unless and until the consumer opts out. *See id.* §§ 1798.100, 1798.120(a). So the collection of basic browsing history information—the IP address, the URLs of the pages visited—on a public website is

routine commercial behavior that, on its own, is not highly offensive. *See Cousin*, 681 F. Supp. 3d at 1126–27; *Thomas*, 2024 WL 2060140, at *7; *see also Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 992 (2011) (finding that "obtaining plaintiff's address without his knowledge or permission, and using it to mail him coupons and other advertisements . . . is not an egregious breach of social norms, but routine commercial behavior").

Plaintiff's reliance on "deceit" as a "plus-factor" theory does not change the analysis. (ECF 38 at 11–12). True, deceit can render an otherwise permissible intrusion highly offensive, but the deceit in the cases plaintiff cites involved continued tracking after users took the very step—logging out or opting out—that the defendant represented or promised would end it. *See, e.g., Facebook Tracking*, 956 F.3d at 602. Here, by contrast, AFHI's privacy policy freely acknowledges that it uses cookies and tracking technologies and identifies the third-party vendors involved. (ECF 37-1). Disclosing the challenged practice is the opposite of concealing it. To be fair, plaintiff does point to an affirmative statement in the policy—that AFHI's own "cookies" do not track user activity on third-party sites—which she alleges is inaccurate. (ECF 29 at 11, 29, 35; ECF 37-1 at 5). But deceit renders an intrusion offensive because a false assurance lulls the user into an expectation that her activity is private. *See Facebook Tracking*, 956 F.3d at 602. The second amended complaint forecloses that theory on its own terms: plaintiff alleges that no notice was presented during her visit and that she relied on the *absence* of any notice—not on anything the policy said. (ECF 29 at 26–27). A representation plaintiff never encountered until after this lawsuit began could not have set any expectation, and its alleged inaccuracy therefore cannot make the intrusion deceitful as to her. What remains is an argument that AFHI's disclosure was insufficiently conspicuous. That is a regulatory-notice argument (and one which the California Attorney General may wish to investigate), but it is not deceit rendering routine internet metadata tracking highly offensive.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-03920-SK Date: August 13, 2026

Title Emily Rodriguez v. Accident Fund Holdings, Inc.

**IV.**

For all these reasons, AFHI's motion to dismiss the second amended complaint (ECF 36) is GRANTED. While leave to amend generally should "be freely given when justice so requires," Fed. R. Civ. P. 15(a)(2), the possibility that plaintiff could allege facts sufficient to establish a highly offensive injury based on visiting and loading a webpage is less than negligible—plaintiff did not opt out, did not input user-specific data, and visited a site whose privacy policy disclosed data collection. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). And as her counsel confirmed at the hearing on this motion, no third amended complaint would allege that plaintiff read the privacy policy or suffered concrete harm. Granting leave to amend would thus be futile because "it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Armstrong v. Reynolds*, 22 F.4th 1058, 1071 (9th Cir. 2022); *see Roth v. Garcia Marquez*, 942 F.2d 617, 628 (9th Cir. 1991) (One reason amendment may be futile is "the inevitability of a claim's defeat on summary judgment."). The second amended complaint is dismissed without leave to amend. *See Sharkey v. O'Neal*, 778 F.3d 767, 774 (9th Cir. 2015). Judgment dismissing this action with prejudice will be entered accordingly.

IT IS SO ORDERED.